IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CARGILL, INCORPORATED,

                Plaintiff,

                                  Civil Action No.
                                  5:03-CV-0530 (DEP)

    vs.

SEARS PETROLEUM & TRANSPORT
CORP., and SEARS ECOLOGICAL
APPLICATIONS CO., LLC,

                Defendants.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

FULBRIGHT, JAWORSKI LAW FIRM    ALAN M. ANDERSON, ESQ.
225 South Sixth Street               RENEE L. JACKSON, ESQ.
Suite 4850                        CHRISTOPHER YOUNG, ESQ.
Minneapolis, Minnesota 55402

MACKENZIE, HUGHES LAW FIRM    STEPHEN T. HELMER, ESQ.
101 South Salina Street
Suite 600
Syracuse, New York 13221

FOR DEFENDANTS:

LATHROP, GAGE LAW OFFICE      WILLIAM R. HANSEN, ESQ.
230 Park Avenue
Suite 1847
New York, NY 10169

WALL, MARJAMA & BILINSKI, LLP      INDRANIL MUKERJI, ESQ.
101 South Salina Street, Suite 400
Syracuse, NY 13202

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

DECISION AND ORDER

This action arises out of a commercial dispute between Cargill, Inc.

("Cargill"), a Delaware corporation with a principal place of business in

Wayzata, Minnesota and engaged principally in the manufacture and sale

of agricultural, food, and industrial products and services, and defendant

Sears Petroleum & Transport Corporation ("Sears Petroleum") and its

affiliate, Sears Ecological Applications Co., LLC ("SEACO") (collectively

"Sears"), both headquartered in Upstate New York and historically

operating in the gasoline and industrial fuel industry, though with relatively

recent efforts toward expansion into the commercial de-icing market.

Central to the dispute is a patent, issued in October of 2001 and assigned

to Sears Petroleum, as well as the commercial de-icing invention which it

teaches.  At trial Sears claimed, and the jury found, that after meeting with

Sears representatives to discuss the prospect of a joint venture for the

development and sale of a commercial de-icing product, utilizing Sears'

technology and Cargill's dominant position in the industry and access to

2

rock salt from its mines, Cargill employees misappropriated trade secret information divulged during the session by Sears concerning its new, innovative liquid de-icer, and thereafter developed and marketed a pre-treated rock salt de-icing product utilizing, as an ingredient, a liquid formulation derived from Sears' formulation, thereby infringing the claims set forth in its later-acquired patent.

In the wake of the entry of judgment based upon the jury's verdict and certain additional findings by the court, both sides have filed post-trial motions seeking various relief.  Because I find no basis to disturb either the jury's findings or my rulings prior to, during and following the trial, -the several cross-motions seeking judgment as a matter of law ("JMOL") notwithstanding the jury's verdict and/or a new trial are denied.  In light of my finding that this represents an exceptional case, however, I am granting Sears' application for an award of attorney fees and nontaxable costs.[1]

I.    BACKGROUND

The factual circumstances surrounding the parties' claims and

---

[1]        The Sears parties have filed a bill of costs seeking taxable costs under Rule 54(d) of the Federal Rules of Civil Procedure, Northern District of New York Local Rule 54.1 and 28 U.S.C. §1920, in the total amount of $304,542.81.  That bill of costs, which is opposed in large part by Cargill, will be addressed separately.

defenses in this action were addressed in detail in several decisions, familiarity with which is presumed, rendered earlier in this action, including *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 334 F. Supp.2d 197 (N.D.N.Y. 2004).  I will recount only so much of the background as is necessary to provide context to my rulings, including with regard to the judgment which was entered.

In or prior to 1998 David Wood, an officer and employee of defendant Sears Petroleum, set out to explore development of an improved de-icing agent which would minimize or eliminate some of the inherently undesirable traits associated with then-existing formulations, including the presence of high molecular weight organic materials, phosphorus compounds and heavy metals, as well as difficulties associated with stratification during storage and the plugging of filters and nozzles resulting from product inconsistencies.  To assist in the formulation of an improved de-icing agent, Sears engaged the services of Robert A. Hartley, a Canadian chemist.

In December of 1998, inventors Wood and Hartley received test results from BodyCote Ortech, Inc. ("BodyCote"), a Canadian laboratory retained to perform various analyses associated with their efforts,

4

disclosing a synergistic freezing point depressive effect experienced by combining low molecular weight carbohydrates and magnesium chloride. Inventors Wood and Hartley followed this discovery with the filing of a utility patent application on January 4, 1999, and later a continuation-in-part ("CIP") application on January 5, 2001, ultimately leading to the issuance on October 9, 2001 of United States Patent No. 6,299,793 (the '793 patent") to inventors Wood and Hartley, and assignment of that patent to Sears Petroleum.[2]

On July 29, 1999 a meeting was held in Rome, New York, where Sears Petroleum maintains its offices, between representatives of Sears, including David Wood, and Cargill, a leading commercial producer of rock salt. The purpose of that meeting was to explore the formation of a joint business relationship between the two companies to operate in the de-icing arena. Following that session, which was relatively brief, the parties met again on August 25, 1999 at Cargill's offices in North Olmsted, Ohio to continue their discussions regarding the prospects of a joint business relationship. Prior to that second meeting, which was considerably

---

[2]     Those filings followed an earlier provisional parent application, submitted by inventors Hartley and Wood on January 7, 1998, disclosing the concept of using a combination of a freezing point depressant, a film former, and water in a refined form to overcome the problems associated with conventional de-icer products.

lengthier than the earlier one, the parties entered into a written confidentiality agreement drafted by Cargill representatives, and intended to govern the exchange of information during those talks and protect the integrity of any confidential information disclosed by either of the parties.

Shortly after the 1999 meetings, Cargill began researching the use of cane molasses, a source of low molecular weight carbohydrates discussed by Wood with Cargill representatives at the second session, as a liquid de-icing agent ingredient. These newly directed exploration efforts led to Cargill's development of a product line bearing the ClearLane label including, *inter alia*, ClearLane Treated Salt and ClearLane PNS Treated Salt, two de-icers manufactured utilizing a liquid comprised of cane molasses, magnesium chloride, and other constituents as a pre-wetting agent to be sprayed onto rock salt prior to its application upon roadways and other surfaces where ice may form, in order to reduce scatter and enhance the salt's ice melting capability. Cargill began selling the ClearLane Treated Salt products in October of 2000, and since then has experienced a significant rise in the sales of those products, to a point where in its fiscal year ending May 31, 2004 it sold 318,140 tons of the treated salt, as compared to the 22,957 tons marketed in the first year

6

after introduction of the new product.

II.    PROCEDURAL HISTORY

This case, which is before me based upon consent of the parties

pursuant to 28 U.S.C. § 636(c), *see* Dkt. No. 61, was tried before a jury,

beginning on February 7, 2005.  On March 10, 2005, following a

protracted period of deliberation, the jury returned a unanimous verdict,

utilizing a jury verdict form which was supplied for its use.  In its verdict,

the jury addressed Cargill's declaratory judgment claims, asserting both

non-infringement and patent invalidity/unenforceability, and various patent

and common law counterclaims asserted by the Sears parties.  Rejecting

the several defenses offered by Cargill to Sears' infringement claims, the

jury found that each of the claims of the '793 patent was infringed by

Cargill's manufacture and use of ClearLane Liquid and ClearLane PNS

Liquid in its ClearLane Treated Salt products, either literally or under the

doctrine of equivalents.  The jury declined Sears' invitation, however, to

find that Cargill's infringement was willful.  On the issue of patent

damages, the jury found that Sears Petroleum had experienced lost profits

in the amount of $355,422 as a result of Cargill's infringing conduct, and

affixed a reasonable royalty for Cargill's use of Sears' patented technology

7

at $1,777,113, calculated utilizing a royalty rate of $.1875 per gallon of liquid.[3]

With respect to the various common law counterclaims asserted by the Sears parties, the jury found that Cargill had unlawfully misappropriated trade secrets from Sears Petroleum, and engaged in unfair competition with that entity.  The jury also found that by its actions, Cargill breached a confidentiality agreement entered into between the parties in August of 1999, but rejected Sears' request for an award of punitive damages with regard to the trade secret misappropriation and unfair competition claims.  The jury awarded damages in varying amounts in connection with the common law claims upon which liability was found.

On April 12, 2005, following extensive briefing by the parties, I issued a decision and order addressing the jury's verdict and JMOL motions made by the parties at various stages of the trial, pursuant to Rule 50 of the Federal Rules of Civil Procedure.  Dkt. Nos. 358, 384.  Judgment was thereafter entered on that same date in which, *inter alia*,

---

[3]     Based upon the formula employed at the relevant times by Cargill in its manufacture of the treated salt product, this translates to a royalty rate of $1.50 per ton of ClearLane Treated Salt – half of the amount sought by the Sears parties at trial as a reasonable royalty rate.

Sears was awarded a total of $2,841,029.03 in damages as well as equitable relief, although the injunction issued to prohibit Cargill's continued infringement of the '793 patent was conditionally stayed pending appeal.  Dkt. No. 359.

On April 26, 2005 both sides filed post-judgment motions, seeking various forms of relief.  For its part, Cargill filed three motions seeking 1) JMOL or, alternatively, a new trial on the Sears common law counterclaims, Dkt. No. 370; 2) a new trial, based upon the conduct of defendants' counsel and the court during the course of the trial, Dkt. No. 371; and 3) a motion for JMOL or, in the alternative, a new trial on the defendants' patent law claims, Dkt. No. 373.  The motions filed by the Sears parties on that date included 1) a motion for alteration of the judgment to include an award of enhanced patent damages, Dkt. No. 367; 2) an application for a finding of an exceptional case and an award of attorney fees, expert fees and non-taxable costs, Dkt. No. 368; and 3) a motion to amend/correct the judgment to include an award of lost profits pursuant to the jury's verdict.  Dkt. No. 369.  Those motions, which have been fully briefed and orally argued, are now ripe for determination.

III.    DISCUSSION

9

A.     Standards of Review

Various of the motions currently pending before the court seek

JMOL and/or a new trial.  The standards which govern such motions,

while not entirely dissimilar, are distinctly different.  Despite their

differences, however, both are tempered by Rule 61 of the Federal Rules

of Civil Procedure, which provides that

> [n]o error in either the admission or the exclusion
> of evidence and no error or defect in any ruling or
> order or in anything done or omitted by the court or
> by any of the parties is ground for granting a new
> trial or for setting aside a verdict or for vacating,
> modifying, or otherwise disturbing a judgment or
> order, unless refusal to take such action appears
> to the court inconsistent with substantial justice.
> The court at every stage of the proceeding must
> disregard any error or defect in the proceeding
> which does not affect the substantial rights of the
> parties.

Fed. R. Civ. P. 61; *McDonough Power Equip., Inc. v. Greenwood*, 464

U.S. 548, 553-54, 104 S. Ct. 845, 848-49 (1984); 11 Charles Alan Wright,

*et al.*, Federal Practice & Procedure § 2882 (2d ed. 1995).

1.     JMOL

Motions seeking JMOL, following a jury trial, are governed by Rule

50(b) of the Federal Rules of Civil Procedure.  That rule provides, in

relevant part, that

10

> [i]f, for any reason, the court does not grant a
> motion for judgment as a matter of law made at the
> close of all the evidence, the court is considered to
> have submitted the action to the jury subject to the
> court's later deciding the legal questions raised by
> the motion.  The movant may renew its request for
> judgment as a matter of law by filing a motion no
> later than 10 days after entry of judgment – and
> may alternatively request a new trial or join a
> motion for a new trial under Rule 59.

Fed. R. Civ. P. 50(b).  The rule goes on to provide that in ruling upon such

a motion a court may allow the judgment to stand, order a new trial, or

direct the entry of judgment as a matter of law notwithstanding that a

verdict was returned against the moving party.  *Id.*; 9A Charles Alan

Wright & Arthur R. Miller, Federal Practice & Procedure § 2538 (2d ed.

1995).

The burden which a litigant faces when seeking JMOL in the face of

an adverse jury verdict, while not insurmountable, is substantial.  The

entry of JMOL notwithstanding a contrary jury verdict is appropriately

granted only when the evidence, viewed in a light most favorable to the

non-moving party, is susceptible to only one possible verdict.  *Jund v.

Town of Hempstead*, 941 F.2d 1271, 1290 (2d Cir. 1991) (citations

omitted); *Chang v. City of Albany*, 150 F.R.D. 456, 459 (N.D.N.Y. 1993)

(McAvoy, C.J.) (citing, *inter alia*, *Jund*).  The granting of such relief is

11

warranted when

> (1) there is such a complete absence of evidence
> supporting the verdict that the jury's findings could
> only have been the result of sheer surmise and
> conjecture, or (2) there is such an overwhelming
> amount of evidence in favor of the movant that
> reasonable and fair minded men could not arrive at
> a verdict against him.

*Jund*, 941 F.2d at 1290 (quoting, *inter alia*, *Mattivi v. South African Marine*

*Corp.*, 618 F.2d 163, 168 (2d Cir. 1980)); *see also Nimely v. City of New*

*York*, 414 F.3d 381, 390 (2d Cir. 2005).  In deciding a motion for JMOL,

the court must draw all reasonable inferences in favor of the non-moving

party and may not make credibility determinations or weigh the evidence,

those functions properly falling within the jury's province.  *Jund*, 941 F.2d

at 1290; 9A Wright & Miller, Federal Practice & Procedure § 2527; *see*

*also Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (citations omitted).

> 2.   New Trial

Post-trial motions seeking a new trial are governed by Rule 59 of the

Federal Rules of Civil Procedure.  That rule provides, in pertinent part,

that

> [a] new trial may be granted to all or any of the
> parties and on all or part of the issues . . . in an
> action in which there has been a trial by jury, for
> any of the reasons for which new trials have

> heretofore been granted in actions at law in the
> courts of the United States[.]

Fed. R. Civ. P. 59(a).

While any appeal from the judgment entered in this case will go to the Federal Circuit, whose position on matters involving patent law are binding upon this court, to the extent that either party's motion for a new trial is based upon matters not involving issues of pure patent law, it is addressed to "the established, discernable law of the involved circuit[,]" in this case the Second Circuit. *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1440 (Fed. Cir. 1984), *overruled on other grounds*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998). In this circuit, a new trial is warranted only when the court is convinced that the jury has reached a "seriously erroneous result" or that the verdict represents a "miscarriage of justice." *Nimely*, 414 F.3d at 392 (internal quotations and citations omitted); *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 875 (2d Cir. 1992); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998); *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998) (citation omitted); 11 Wright, *et al.*, Federal Practice & Procedure § 2805.

Unlike the case with regard to a motion for JMOL under Rule 50(b),

when addressing a new trial motion a court is permitted to weigh the evidence adduced at trial, and is not necessarily bound to view it in a light most favorable to the non-moving party. *DLC Mgmt. Corp.*, 163 F.3d at 133-34.  A jury's credibility determinations, however, are entitled to great deference, and mere disagreement by the court with a jury's verdict, without more, does not entitle a party to relief under Rule 59. *Meiselman v. Byrom*, 207 F. Supp.2d 40, 42 (E.D.N.Y. 2002).  A court should generally be indisposed to disturb a jury's verdict on a Rule 59 motion unless the verdict is considered to have been "'egregious.'"  *Id.* (quoting, *inter alia*, *DLC Mgmt. Corp.*, 163 F.3d at 134).

### B.    Cargill's Motion For a New Trial

The centerpiece of Cargill's quest for post-trial relief is its application for a new trial, based principally upon the claim that it was denied a fair trial.  In that motion, Cargill complains of errors committed by the court – errors which, as will be seen, it describes as transcending the type of trial court error typically complained of, and the stuff of which appeals are made, instead rising to a level tantamount to court misconduct.  Cargill also criticizes the conduct of Sears' counsel throughout the litigation, and additionally raises concerns over the court's instructions to the jury and

the verdict form submitted for its use, and challenges certain portions of the jury's verdict which, in its view, are inconsistent with the evidence adduced at trial.

     1.   <u>Fair Trial</u>

Before turning to the specifics of Cargill's new trial motion, one point must be made. It is virtually certain that neither party in this case received a perfect trial. Both prior to and throughout the course of the trial, which was permeated with contentiousness, the court was called upon to make many evidentiary, *in limine*, and substantive rulings, some of which implicated complex intellectual property law concepts. A showing that a party has not received a perfect trial, however, falls far short of the significant threshold which that party must surpass in order to demonstrate entitlement to a new trial. As the Supreme Court has observed,

> [t]his Court has long held that a litigant is entitled to a fair trial, but not a perfect one, for there are no perfect trials. Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload.

15

* * *

> We have also come a long way from the time when
> all trial error was presumed prejudicial and
> reviewing courts were considered "citadels of
> technicality."  The harmless error rules adopted by
> this Court and Congress embody the principle that
> courts should exercise judgment in preference to
> the automatic reversal for "error" and ignore errors
> that do not affect the essential fairness of the trial.

*McDonough Power Equip., Inc.*, 464 U.S. at 553-54, 104 S. Ct. at 848-49

(internal citations and some quotation marks omitted).  Having reviewed

Cargill's new trial motion carefully against this backdrop, I discern no

substantial and unfairly prejudicial errors which deprived it of a

fundamentally fair trial.

The bases articulated by Cargill in its motion for seeking a new trial

fall into four main categories, each of which will be separately addressed.

a)    <u>Reference to Size and Location of the Parties</u>

_____In its new trial motion, Cargill complains of the efforts of Sears'

counsel to taint the jury by stressing both defendants' connections to the

Upstate New York region and the disparity, in terms of both relative size

and financial resources, between the respective parties.  Cargill contends

that those efforts, notwithstanding the court's curative instructions –

characterized by Cargill as "bland" – resulted in undue prejudice and

16

effectively denied Cargill its right to a fair trial.

The issue of relative size of the parties was raised by Cargill in one of sixteen motions *in limine* which were fully briefed and decided by the court in advance of trial.  *See* Dkt. No. 156.  That motion was denied, though without prejudice, based upon my finding that the motion lacked context, and that the financial resources and number of employees available to Cargill was potentially relevant to at least some of the issues which could arise at trial.  *See* Transcript of January 12, 2005 Proceedings (Dkt. No. 234) at 82-90.  Employing the reasoning articulated in *TVT Records v. Island Defendant Jam Music Group*, 250 F. Supp.2d 341, 344 (S.D.N.Y. 2003), in which another court was confronted with what it characterized as improper *in limine* motions seeking preemptively "to strike in shotgun fashion at whole topics and sources of prospective evidence,"  I denied the motion, but indicated that I would police the trial to guard against undue prejudice, and would instruct the jury that every party, regardless of size, is entitled to the same fair consideration when litigating in the courts.  Transcript of January 12, 2005 Proceedings (Dkt. No. 234) at 89-90.

During opening statements Sears' counsel in fact did make

17

reference to the relative size of the parties, as apparently anticipated by

Cargill.  Rather than registering a contemporaneous objection, Cargill's

counsel instead chose to present the issue in the form of a motion for a

mistrial.  Trial Transcript 2/8/05 (Dkt. No. 291) at 158-60.  While that

mistrial motion was denied, I provided the jury with a curative instruction,

as follows:

> First, statements were made during the Sears
> parties' opening regarding the size of Cargill and
> the relative size of Cargill and the Sears entities.
> As I stated at the outset to you, you must perform
> your duty as jurors without bias or prejudice as to
> any party.  The law does not permit you to be
> governed by sympathy, prejudice or public opinion.
> Your verdict must be based solely upon the
> evidence developed at trial or the lack of evidence
> considered in light of my instructions concerning
> the applicable law.  In reaching your decision, it
> would be improper for you to consider any
> personal feelings you may have about any party's
> status or size.  All parties expect that you will
> carefully and impartially consider all of the
> evidence, follow the law as it is being given to you
> at the close of the case, and reach a verdict
> regardless of the consequences.  Simply stated,
> the parties in this case are entitled to be treated
> equally.  All persons are equal before the law, of
> equal worth and station in life, and each party is
> therefore entitled to the same fair and
> conscientious consideration by you as any other
> party.

Trial Transcript 2/9/05 (Dkt. No. 292) at 200-01.  This remedial instruction

was augmented by the customary, prophylactic charge, administered both prior to and at the close of the case, to the effect, in substance, that each party, regardless of size, is entitled to the same fair consideration, Trial Transcript 2/9/05 (Dkt. No. 292) at 200-01; Trial Transcript 3/3/05 (Dkt. No. 397) at 3204, and additionally that arguments of counsel do not constitute evidence, Trial Transcript 2/7/05 (Dkt. No. 290) at 64, 84; Trial Transcript 2/9/05 (Dkt. No. 292) at 201-02; Trial Transcript 3/3/05 (Dkt. No. 397) at 3205-07.  These instructions, which the jury is presumed to have followed, *see Richardson v. March*, 481 U.S. 200, 206, 107 S. Ct. 1702, 1707 (1987), eliminated any prejudice potentially suffered by Cargill as a result of comments by defendants' counsel regarding relative size.[4]

b.    The Court's Conduct at Trial

While breathing life into the cold record upon which appellate review of this case will be based is impossible, I will attempt to inject at least some context into the discussion of Cargill's claim of misconduct on the

---

[4]    In arguing that Sears improperly attempted to prejudice it in the eyes of the jury, based upon its size and resources, Cargill does not come before the court with entirely clean hands.  During the trial, including in its opening and closing arguments, Cargill embarked upon a similar course, attempting to besmirch Sears by portraying it as an unduly litigious entity which unreasonably sued, or threatened litigation, as a routine business practice when attempting to deal with other companies engaged in the de-icing industry.  *See, e.g.*, Trial Transcript 2/7/05 (Dkt. No. 290) at 101-02; Trial Transcript 3/3/05 (Dkt. No. 397) at 3137.

part of the court by first setting the stage.  Anyone who participated in or witnessed the trial in this matter appreciates that it involved highly complex legal and factual issues which presented daunting challenges to the jury, comprised as it was of seven hardworking and attentive individuals with no particular technical expertise in the subject matters involved, and quite frankly, to the court as well.  And, as is often the case with litigated matters involving intellectual property rights, the atmosphere was at times tense, and pressure packed, with hotly contested issues presented at every turn.

Seemingly taking a cue from recent events suggesting an open season for unprecedented levels of criticism of the judiciary, Cargill has chosen to turn its sights on the court, arguing that as a result of my efforts to control the level of intensity at trial through occasional use of benign humor, and additionally by making various adverse evidentiary rulings, I deprived Cargill of a fundamentally fair trial.  The essence of plaintiff's court misconduct argument is that through my actions and comments, I effectively signaled to the jury that it should rule in favor of the Sears parties.

_____The arguments of court misconduct which Cargill now makes in

20

support of its new trial motion are new to the scene.  At no time during the course of the trial, during which the court's relationship with counsel for the parties seemed both professional and collegial, with virtually daily conferences conducted in chambers after the jury was released, did Cargill's attorneys suggest or even intimate their belief that either they or their client had been unfairly treated by the court.  Not until the jury returned its adverse verdict did Cargill resort to making this claim.

Having reflected on the matter and carefully reviewed the trial record, in the light of Cargill's claims of court misconduct, I find no basis to conclude that a new trial is warranted.  None of the comments now seized upon by Cargill in support of its motion were intended to influence the jury, nor is there any reason to believe that they were construed otherwise. Moreover, the jury was specifically instructed to the effect that nothing said by the court should be considered as indicating a belief as to what its verdict should be.  Trial Transcript 2/7/05 (Dkt. No. 290) at 64; Trial Transcript 3/3/05 (Dkt. No. 397) at 3203-04.

The cases relied upon by Cargill in the portion of its motion addressed to the court's conduct are wholly inapposite, involving conduct not at all comparable to the matters alluded to in its motion.  In *Caskey v.*

21

*Village of Wayland*, for example, the Second Circuit found that in its jury instructions the court had made statements, characterized as "pejorative in nature", regarding remarks of plaintiff's counsel on the question of damages, conveying the court's impression that in requesting a large award "counsel somehow had acted improperly and . . . the damages being sought were exorbitant[.]"  375 F.2d 1004, 1009 (2d Cir. 1967). Similarly, the statements relied upon by the court in *Rivas v. Brattesani*, 94 F.3d 802, 803, 807-08 (2d Cir. 1996), in ordering a new trial, were caustic and direct, and plainly conveyed the court's negative impressions regarding both the defendants and their counsel.  In this instance, by contrast, none of the comments relied upon by Cargill in its motion were either intended, or could be reasonably construed, to disparage Cargill or its counsel.

In sum, while on appellate review the Federal Circuit may well take issue with some of the many rulings made during the course of the trial, I am unable to say that based upon those rulings or the court's various offhand and innocuous remarks, none of which were directed at or derogatory to either Cargill or its counsel, plaintiff was deprived of a fair trial.

22

### c.    The Conduct of Sears' Counsel at Trial

In its motion, Cargill complains of various conduct on the part of Sears' counsel, extending beyond mere reference to the relative sizes and resources of the parties, including 1) making of "speaking objections"; 2) vouching for witness credibility; 3) suggestions of impropriety on the part of Cargill's counsel; and 4) generally engaging in "grandstanding".

A party seeking a new trial on the basis of the conduct of trial counsel, and in particular allegedly improper statements in the jury's presence, is confronted with a substantial burden; "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 271 (2d Cir. 1999) (citation and internal quotation marks omitted), *cert. denied*, 528 U.S. 1119, 1120 S. Ct. 940 (2000).  When a jury's verdict is supported by the evidence at trial, statements improperly made by trial counsel are generally regarded as *de minimis* when placed in the context of the trial as a whole.  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (citing *Pappas v. Middle Earth Condo., Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992)).

As I have already noted, this matter was fiercely litigated.  Both

23

counsel at times challenged the court's patience and endeavored to test boundaries that had previously been set.  While Cargill complains of such conduct on the part of Sears' counsel, that conduct was no more egregious than the litigation strategy employed by Cargill, whose counsel made a fair share of the objections at trial and was equally critical of Sears and its witnesses as, it now contends, was Sears' counsel of witnesses testifying on behalf of Cargill.

Having reviewed the specifics offered by Cargill in support of its claim of misconduct on the part of Sears' counsel, I can find no basis to conclude that a new trial is warranted.  While Sears' counsel did offer fair comment on certain matters, including witness credibility, at no time did any of its attorneys cross the line and vouch for the credibility of any witnesses.  Moreover, while it is true that various statements were made concerning Cargill and its motivations, in many respects those were in response to, and no more egregious than, Cargill's attempt to portray the Sears parties as unduly litigious in their efforts to protect and enforce the '793 patent.  Accordingly, and based upon my finding that the jury's verdict is amply supported by the evidence in the record and none of the conduct alluded in Cargill's motion so infected the process as to deny

24

Cargill its right to a fair trial, this portion of Cargill's motion will be denied.

> d.    Various Alleged Errors in Evidentiary Rulings and Jury Instructions

In support of its contention that it did not receive a fair trial, Cargill advances several contentions, many of which seek merely to rehash arguments already made and rejected – in some instances on multiple occasions.  Other portions of Cargill's motion address evidentiary rulings made during the course of the trial, and jury instructions now claimed by plaintiff to have been erroneous.  Having reviewed the matter, I find that none of the issues now raised in this portion of Cargill's motion rise to a level sufficient to support the request for a new trial, those arguments instead being more appropriately reserved for presentment to an appellate court.[5]

> 2.    Weight of the Evidence

Among the arguments now raised by Cargill is its claim that the finding that Sears disclosed trade secret information during the August, 1999 meeting is against the weight of the evidence. While the evidence is conflicting on this score, with certain of Cargill's witnesses having denied

---

[5]    Certain of the matters raised in Cargill's new trial motion are also discussed elsewhere in this decision, including, *inter alia*, in the portion addressing separately filed motions for a new trial on the patent and common law claims.

receiving trade secret information during the August, 1999 meeting that

was not freely disclosed earlier, when no confidentiality agreement was in

place, there was evidence, including in the form of David Wood's

testimony, to support the jury's finding.  *E.g.*, Trial Transcript 2/17/05 (Dkt.

No. 364) at 1558, 1570-71, 1587-88.  Wood's testimony in this regard is

buttressed by the fact that immediately following the meeting, Cargill

researchers markedly shifted their course and began exploration of the

use of cane molasses as a source of low molecular weight carbohydrates

to be utilized in a liquid de-icer.  These facts provide a sufficient basis to

uphold the jury's verdict with regard to the trade secret misappropriation.

### 3.      Correction of the Jury's Damage Calculation

In its motion, Cargill also implores the court to rectify what it

characterizes as an obvious miscalculation reflected in the jury's award of

patent damages based upon a reasonable royalty theory.  Cargill argues

that the evidence presented at trial reflected its sale of ClearLane Treated

Salt only through January 31, 2005, and quarrels with what appears to be

the jury's extrapolation of available figures to account for sales between

February 1, 2005 and the date of its verdict on March 10, 2005.  Cargill

maintains that the error can be explained by speculation on the part of the

jury that it sold 200,000 tons of ClearLane Salt between February 1, 2005

and the date of the verdict, yielding a royalty of $300,000, and asserts,

based upon information which was not made available to the jury or

defendants' counsel during the trial, that the figure is unduly inflated in

light of the fact it sold only 101,193 tons of the accused product during

that time period.  *See* Plaintiff's Reply Memorandum (Dkt. No. 415) at 1.

The fact that information regarding Cargill's pre-verdict sales is now

available stands in marked contrast to the situation presented at trial.

Both prior to and during the course of the trial Sears was forced to elicit

the court's assistance in order to receive even the most basic of

information, undoubtedly at Cargill's ready disposal, concerning the sales

of the infringing ClearLane Treated Salt products.  Dkt. Nos. 254; 290, at

11-16.  In light of its recalcitrance to provide the requested information,

which would perhaps have allowed the jury to make a more precise and

informed calculation of reasonable royalties, Cargill cannot now be heard

to challenge the jury's verdict and its reasonable assumption concerning

the continued level of sales of the accused products, based upon

evidence developed only after return of the jury's verdict.  *Compare Jay*

*Edwards Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 821-

22 (1st Cir.), *cert. denied*, 464 U.S. 894, 104 S. Ct. 241 (1983) (defendant could not object to jury's reasonable interpretation of plaintiff's damages evidence after the fact when it could have come forward with its own evidence) *with Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 142-45 (2d Cir. 1998) (allowing remand for recalculation of damages when district court based calculation on unforeseen theory and neither party had opportunity to present evidence; distinguishing situation where a party objects after the fact when it had opportunity to present its own evidence).  Accordingly, I find no basis to invade the jury's province and usurp its function by recalculating damages.

In sum, I have carefully reviewed the record in light of Cargill's various arguments, and find no basis to conclude that it was denied a fundamentally fair trial, or that there is a basis to vacate the judgment entered and order a new trial.

## C.   Cargill's Motion for JMOL on Patent-Related Issues

In one of its post-trial motions, plaintiff has sought relief from certain patent-related aspects of the jury's verdict.  Cargill's motion calls upon the court to address a variety of issues, most of which have been thoroughly aired in prior settings, surrounding the Sears parties' patent infringement

28

claims and its defenses to those claims.

### 1.   Vagueness Of Claim Construction

In its motion, Cargill renews its complaints regarding the vagueness of the court's construction of the claims contained within the '793 patent. Echoing arguments rejected prior to trial, *see* Decision and Order dated January 18, 2005 (Dkt. No. 205) at 9-12, Cargill essentially requests that I redraft the '793 patent to import into it bright lines of demarcation for various of the chemical constituents described in the patent claims by extrapolation from examples cited by the inventors.  Urging the court to do its duty under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct.1384 (1996), Cargill requests quantification of such terms of "incidental impurities", "harmless ingredients", "refined and consistent source" and "incidental amounts of insoluble components" and suggest that the failure to more adequately define those terms for the jury requires the entry of JMOL in its favor.

For the reasons set forth in my earlier decision I decline Cargill's invitation, finding it inappropriate for the court to engage in claim drafting, as opposed to claim construction.[6,7]

---

[6]      Given the monumental effort and expense involved in litigating a typical patent infringement case to verdict and on appeal, one cannot help but lament the fact

2.      Infringement Under Doctrine of Equivalents

Renewing its earlier argument that by operation of prosecution history estoppel Sears has relinquished its ability to assert infringement under the doctrine of equivalents, Cargill seeks the entry of JMOL setting aside the jury's finding of infringement of claims four, five, six and eight.[8] The essence of plaintiff's argument is that by virtue of representations by the '793 inventors to the patent examiner, Sears has essentially forfeited its right to claim that the thickener referenced in claims four, five, six and eight of the '793 patent could be inherent in, rather than added to, the other ingredients of the de-icing agent at issue.

As Cargill now argues, a patentee may be estopped from alleging

_____

that the governing rules do not encourage parties to seek interlocutory appellate review by the Federal Circuit of a trial court's claim construction despite the fact that such review is *de novo*, *see Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-55 (Fed. Cir. 1998), particularly since in most instances a jury's verdict regarding infringement claims hinges upon the propriety of the court's claim construction.

[7]      Cargill has urged the Federal Circuit's recent decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) in support of its request that the court revisit its earlier ruling regarding the patent's dependent claims referencing thickeners and colorants, and specifically my finding that they could be either inherent in or added to the composition described in the independent claims to which those dependent claims relate.  That case, which does not represent a marked departure from pre-existing jurisprudence regarding claim construction, does not provide a basis for the court to reassess its earlier findings regarding this issue.

[8]      During oral argument Cargill's counsel candidly acknowledged that neither the outcome of the case nor the judgment entered would be affected, were the court to rule in its favor on the prosecution history estoppel issue.

infringement under the doctrine of equivalents when, in response to rejection of an initial application for reasons related to patentability, including based upon prior art, the rejection results in a subsequent narrowing of a claim by the inventors. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733-34, 122 S. Ct. 1831, 1838 (2002); *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1351-53 (Fed. Cir. 2004) (discussing *Festo*).  The mere fact of such a narrowing amendment, however, does not automatically preclude the patentee from claiming infringement by equivalents; instead, careful examination of the circumstances surrounding the narrowing amendment is required before invoking prosecution history estoppel. *Festo Corp.*, 535 U.S. at 735-37, 122 S. Ct. at 1839-40; *Glaxo Wellcome, Inc.*, 356 F.3d at 1353-56.

The question of whether claims four, five, six and/or eight were infringed under the doctrine of equivalents by plaintiff's ClearLane Treated Salt products was submitted to the jury, along with an explanation of the concept of prosecution history estoppel and its potential impact upon infringement under the doctrine of equivalents.[9]  Trial Transcript 3/3/05

---

[9]     The stance taken by Cargill regarding prosecution history estoppel has varied over the course of the proceedings.  Cargill, who not only failed to object to the court instructing the jury regarding prosecution history estoppel but in fact requested such an instruction in its pretrial submissions, *see* Dkt. No. 225, at 47, now complains

31

(Dkt. No. 397) at 3225-27.  The jury's verdict, finding infringement of the relevant claims under the doctrine of equivalents, reflects its rejection of Cargill's prosecution history estoppel argument.  That portion of the jury's verdict is amply supported by the evidence adduced at trial, including chiefly the testimony of defendants' expert, Professor Bruce Nauman.

The question of whether the examiner's criticism of the patent application as not sufficiently distinguishing between the low molecular weight carbohydrates specified as one of the key ingredients in the patent invention and the thickeners claimed, coupled with the subsequent placing of limits upon those thickeners in order to provide a clear line of demarcation, should result in preclusion of a finding of infringement under the doctrine of equivalents, was addressed in my first post-trial decision and order, dated April 12, 2005.  Dkt. No. 358, at 16-18.  In that decision I also reviewed the record and concluded that the jury's finding of infringement of claims four, five, six and eight under the doctrine of equivalents by Cargill's ClearLane Treated Salt products was adequately supported by evidence in the record.  *Id.*  Having reviewed those findings once again in the context of Cargill's most recent submissions, I find no

---

that the question is one of law which should not have been submitted to the jury.  *See* Dkt. No. 373, at 4.

basis to override my earlier determination on the issue now presented.

### 3. Dedication of Composition Containing Molasses, Salt and Water to the Public

_____In its motion addressed to patent law issues, Cargill also raises an argument which has not been prominent in its prior submissions.  In essence, Cargill argues that through reference to the use of molasses as a thickener in their January, 1999 patent application, coupled with their failure to disclose or claim any composition specifically containing molasses in the '793 patent, the inventors have effectively dedicated de-icing compositions comprising in part of molasses into the public domain. As support for this position Cargill cites several cases, including *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1115, 117 S. Ct. 1244 (1997).

As a relative newcomer to the scene, this argument was not raised during the course of the trial in any motion advanced by Cargill for JMOL under Rule 50 of the Federal Rules of Civil Procedure.  Since the argument was not properly preserved in such a fashion or otherwise, Cargill is precluded from now seeking JMOL on this "dedicated to the public" argument.  *Nadel v. Isaksson,* 321 F.3d 266, 271-72 (2d Cir. 2003).

33

Turning to the substance of Cargill's belated dedication argument, I find that it lacks merit and that the Federal Circuit's decision in *Maxwell* is readily distinguishable. That case dealt with subject matter disclosed in a patent specification but not included in the patent claims.  86 F.3d at 1106-07.  Responding to that set of circumstances, the Federal Circuit observed that it has "frequently applied [the dedication] rule to prohibit a finding of literal infringement when an accused infringer practices disclosed but unclaimed subject matter." *Id.* at 1107 (citing *Environmental Instruments, Inc. v. Sutron Corp.*, 877 F.2d 1561, 1564 (Fed. Cir. 1989)).

The rationale for invoking such a dedication rule is readily apparent from the court's decision in *Maxwell*; the rule was intended to prevent a patentee from narrowly claiming an invention and later being permitted, whether under a claim of literal infringement or under the doctrine of equivalents, to contend that it also covers far broader subject matters than those disclosed, but not claimed. *Maxwell*, 86 F.3d at 1107.  This case presents the inverse situation, where Cargill challenges a broad specification of low molecular carbohydrates, of which cane molasses is one of many potential sources, claiming that by the more narrow citing of cane molasses as an example of such a source without specifically

34

referencing that source in the patent claims, it has been dedicated to the public.  This, then, is not a situation where subject matter such as the use of cane molasses is disclosed in a specification but not encompassed within a specific patent claim.  This portion of Cargill's motion is therefore also subject to denial, both procedurally and on the merits.

### 4.    Sufficiency of Evidence of Infringement

Despite a wealth of evidence to the contrary, Cargill argues for JMOL claiming that its ClearLane Treated Salt products do not infringe claims one, two, three, five and seven of the '793 patent, and that no reasonable jury could conclude otherwise.  Cargill's challenge to the finding of infringement centers upon its contention that 1) the cane molasses which serves as an ingredient of its ClearLane products is not a refined and consistent source of low molecular weight carbohydrates, as contemplated in the '793 patent; 2) its product also contains carbohydrates falling outside of the molecular weight ranges specified in the patent; 3) ClearLane Liquid does not meet the aqueous solution requirement of the patent; and 4) its accused products do not satisfy the "balance" requirement as set forth in the court's construction of the '793 patent claims.

35

Cargill's arguments relating to non-infringement must be examined in the context of the position which it took at trial, as illuminated by its counsel's opening statement, readily acknowledging that the accused Cargill products contain carbohydrates, chloride salts and water falling within the ranges specified in the '793 patent. Trial Transcript 2/7/05 (Dkt. No. 290) at 103. Had this concession not been made, moreover, the jury's finding of infringement would nonetheless be supported. The evidence presented at trial, including though not limited to the testimony of Professor Bruce Nauman, demonstrated that not only does the accused ClearLane Liquid contain low molecular weight carbohydrates, chloride salts, and water falling within the ranges specified in the '793 patent, but that it meets the other requirements of claims one, two, three and seven of that patent, as construed by the court. Drawing upon information provided concerning its ClearLane products including in its material safety data sheets ("MSDS") and interrogatory answers, as well as independent laboratory testing conducted by BodyCote, Professor Nauman observed that the cane molasses utilized to make Cargill's infringing ClearLane products represented a consistent and refined source and provided low molecular weight carbohydrates within the ranges claimed in the '793

36

patent.  Professor Nauman also testified that plaintiff's product meets the court's definition of an aqueous solution as representing "a uniformly disbursed liquid mixture of two or more components, one of which is water, and which can contain incidental amounts of insoluble components."

Cargill's argument with regard to evidence concerning the "balance" constituent is equally unavailing.  While Cargill contends that according to the testimony at trial, the cane molasses utilized to manufacture its ClearLane products contains at least twenty-five percent of soluble materials other than low molecular weight carbohydrates, including inorganic materials and other carbohydrates, as well as additional constituents, it overlooks the court's construction of the term "balance" which can include "incidental impurities or harmless ingredients associated with the commercial sources of the key components in the invention[.]"  *Cargill*, 334 F. Supp.2d at 220-21.

In sum, the arguments now raised by Cargill to challenge the finding of direct infringement of claims one, two, three and seven of the '793 patent provide no basis to set aside that portion of the jury's verdict.

5.    Patent Invalidity/Priority Date

37

Characterizing the question of priority date as an affirmative defense asserted by the Sears parties to counter plaintiff's own anticipation and obviousness invalidity defenses, on which it acknowledges it bears the burden of proof by clear and convincing evidence, Cargill argues that at trial it was incumbent upon Sears to prove entitlement to the January 4, 1999 priority date with respect to the '793 patent by a preponderance of the evidence. Cargill claims that the court therefore improperly allocated the burden of proof with regard to priority date, asking the jury to measure priority date utilizing the clear and convincing evidence standard applicable to Cargill's invalidity defense. Cargill further asserts that the matter of priority date is one of law addressed to the court, rather than for the jury to decide.[10]

This and Cargill's other invalidity argument must be analyzed against the backdrop of the independent presumption of validity which, by statute, attaches to each claim contained within a regularly issued patent

---

[10]    In its motion, Cargill also complains of the court's reversal of positions regarding this issue after it had given its jury summation. Based upon conferences with the parties and my request for case authority on the issue, at the time of closing arguments Cargill was well aware that I was continuing in my review of the issue, particularly in light of its complexity. The fact that Cargill suggested to the jury what it anticipated the charge would ultimately be, though proper, was made knowing that the issue was still under consideration by the court.

under 35 U.S.C. § 282.  *Continental Can Co., USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1266-67 (Fed. Cir. 1991).  Under section 282, a "party asserting invalidity not only has the procedural burden of proceeding first and establishing a prima facie case, but the burden of persuasion on the merits remains with that party until final decision."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983); *see also ConMed Corp. v. Erbe Electromed Izin GmbH*, 241 F. Supp.2d 187, 192 (N.D.N.Y. 2003) (citing, *inter alia*, *Stratoflex*), *vacated due to settlement*, No. 00-CV-987, 2004 WL 1576596 (N.D.N.Y. June 29, 2004).  Any party seeking to overcome this presumption of validity must do so by clear and convincing evidence.  *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1377 (Fed. Cir. 2002) (citations omitted); *see also Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573-74 (Fed. Cir. 1985).

Plaintiff's invalidity challenges implicate the sufficiency of the written description of the earlier applications under 35 U.S.C. § 112.  "A party asserting invalidity based on 35 U.S.C. § 112 bears no less a burden and no fewer responsibilities then any other patent challenger."  *Ralston Purina*, 772 F.2d at 1574.

Cargill's priority date argument conflates the concepts of burden of

proof with the shifting burdens of production implicated in this case.  As plaintiff correctly notes, a party such as Cargill who asserts patent invalidity bears the initial procedural burden of establishing a *prima facie* case of invalidity.  *Ralston Purina Co.*, 772 F.2d at 1573-74.  When this burden has been successfully shouldered, the burden of production turns to the patentee to demonstrate patent validity.  *Id.*  Nothing in the Federal Circuit's decision in *Ralston Purina* or any subsequent decision suggests that the ultimate burden of proof is also shifted upon a showing of a *prima facie* case of invalidity, as is now asserted by Cargill.

In its post-trial motion related to priority date, Cargill also stubbornly adheres to its position that Federal Circuit decisions involving interference proceedings may be applied to invalidity claims asserted in defense of infringement claims such as this, citing such cases, *inter alia*, as *Cooper v. Goldfarb*, 154 F.3d 1321 (Fed. Cir. 1998).  Those interference proceeding cases, however, are inapposite in infringement actions where invalidity is asserted as an affirmative defense.  *See Ralston Purina Co.*, 772 F.2d at 1574 n. 2.

Cargill's motion also challenges the sufficiency of evidence to support the jury's finding of defendants' entitlement to the January 4, 1999

priority date even assuming that it retains the burden on the question of

priority date.  The evidence adduced at trial, however, demonstrates that

the jury's finding that Cargill had not satisfied its burden of discounting the

January 4, 1999 priority date by clear and convincing evidence is

supported.  Sears' expert, Professor Nauman, explained the usage of the

critical terms in the January 4, 1999 and January 5, 2001 patent

applications.  Utilization of the term "sugars (hexoses, saccharides)" in the

earlier application instead of the low molecular weight language and

images in the later, CIP application, according to Professor Nauman,

would have been understood by a person of ordinary skill in the art to

reference carbohydrates with molecular weights ranging from 180

(hexoses) to about 1476 (oligosaccharides).  This is consistent with the

claims of the '793 patent, which disclosed carbohydrates in the same

approximate low molecular weight ranges.  The testimony of such an

expert may constitute "substantial evidence" on the question of validity.

*E.g.*, *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1333-34 (Fed.

Cir. 2002).

### 6.    Anticipation and Obviousness

In the verdict form provided for its use the jury was asked, on a

claim by claim basis, whether the '793 patent was anticipated and/or obvious.  In its response, the jury uniformly found that the '793 patent claims were neither obvious nor anticipated.  Renewing arguments fully vented on several prior occasions, Cargill again argues that no reasonable jury could have reached this conclusion based upon the evidence adduced at trial.

One way in which a patent may be found to be invalid is through anticipation.  A patent claim is invalid if "the invention was patented or described in a printed publication in this . . . country . . . more than one year prior to the date of the application for patent in the United States[.]" 35 U.S.C. § 102(b).  Under this statutory provision addressing anticipation, "[a] patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention."  *Schering v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citing *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987)).  As the Federal Circuit has noted,

> invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation.

42

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282

(Fed. Cir. 2000), *cert. denied*, 532 U.S. 904, 121 S. Ct. 1226 (2001).

Whether a patent claim is anticipated is a question of fact.  *Advanced*

*Display Sys., Inc.*, 212 F.3d at 1281.  And, because it implicates invalidity,

an anticipation defense interposed by an accused infringer is subject to a

clear and convincing evidence burden of proof.  *See Ralston Purina Co.*,

772 F.2d at 1574.

Cargill's claim of anticipation is based upon cited prior art references

which have been discussed previously, and distinguished.  Uniformly,

those prior art references address the manufacture of de-icing products

using a variety of agricultural waste products including brewers

condensed solubles ("BCS"), distillers condensed solubles ("DCS"), and

cornsteep – a product remaining after the wet milling of corn.  The prior

usage of such products to manufacture de-icing agents was disclosed and

discussed in the '793 patent application, and distinguished based upon

the fact that those products did not represent a source of low molecular

weight carbohydrates meeting the court's requirement that it be refined

and consistent.  None of the prior art references reiterated by Cargill in

support of its motion undermine the jury's verdict and establish that no

43

reasonable factfinder could have concluded that it did not establish anticipation by clear and convincing evidence.[11]

As a related but distinct axiom of patent law, an inventor is also not entitled to a patent if his or her invention would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made.  35 U.S.C. § 103.  As the standard implies, unlike anticipation the obviousness test "is whether the combined teachings of the prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art."  *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).

The prior art references offered by Cargill in support of its obviousness claim are essentially those urged in its anticipation defense. All of the cited references, however, address de-icing products derived from waste materials.  Rather than rendering the '793 patent obvious, these references teach away from reliance upon a refined and consistent

---

[11]     Cargill also urges development and sale of a competing product, Caliber, in support of its anticipation defense.  It acknowledges, however, that if Sears is given the benefit of the January, 1999 priority date its claim of anticipation based upon that product must fail, given the lack of evidence of commercial sales of that product more than one year prior to that filing date.  Since I have found the jury's verdict on the priority date to have been amply supported by the evidence, I have not addressed Cargill's arguments based upon the Caliber product.

source of low molecular weight carbohydrates such as cane molasses. There was ample evidence rejecting Cargill's obviousness defense, and the jury's verdict in this regard was therefore well supported.

### 7.   Inventorship

At trial, Cargill challenged the validity of the '793 patent based upon the failure of the applicants to accurately name the inventors of the subject matter disclosed.  In support of that argument, Cargill argued that David Wood was not truly an inventor of any of the subject matter disclosed in the patent, and that Bodycote Ortech contributed to the invention in a sufficiently significant way as to require its inclusion on the patent application as a named inventor.  In its motion, Cargill maintains that no reasonable factfinder could have concluded that it did not carry its burden of demonstrating invalidity based upon improper inventorship by clear and convincing evidence.[12]

---

[12]    The inventorship issue presented a significant, and arguably unnecessary, distraction for the court and jury.  Had the jury found invalidity on the basis of improper inventorship, the Sears parties nonetheless would have been afforded the opportunity to cure the perceived deficiencies under 35 U.S.C. § 256, based upon a showing of lack of intent to deceive the PTO, and thereby salvage any favorable verdict on their infringement claim.  *Viskase Corp. v. American Nat'l Can Co.*, 261 F.3d 1316, 1329 (Fed. Cir. 2001) ("Absent fraud or deceptive intent, the correction of inventorship does not affect the validity or enforceability of the patent for the period before the correction."); *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350-51 (Fed. Cir. 1998).  Throughout the course of his action Cargill has never proffered evidence of such an intent to deceive the PTO.

The evidence at trial, interpreted in a light most favorable to Sears, plainly demonstrated David Wood's collaboration and contribution to the process leading to the invention forming the basis of the '793 patent.[13] Having identified a need for an improved de-icing product Wood, in collaboration with Robert Hartley, a chemist hired by him to consult regarding the issue, through testing conducted by Bodycote Ortech at Hartley's directive, determined that carbohydrates from a refined and consistent source, as David Wood sought to achieve, could, when combined with a chloride salt and water, provide a synergistic freezing point depressive effect.  David Wood thus had more than merely passing involvement with the invention leading to the '793 patent.

In contrast Bodycote Ortech, which Cargill asserts was a co-inventor, served as no more than a commercial laboratory performing testing at the request of, and in consultation with, both Robert Hartley and David Wood.  Such activities do not render Bodycote Ortech "inventors"

_____

[13]     Indeed, by all accounts David Wood's contribution to the '793 patent appears to have been at least as substantial as was that of Richard Rose, who is listed as a co-inventor on the subsequently issued patent covering the ClearLane products, to the development of that line.  *Compare* Trial Transcript 2/17/05 (Dkt. No. 364) at 1452-97 *with* Trial Transcript 3/1/05 (Dkt. No. 395) at 2862-77.

within the meaning of the patent law.[14]  *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1229-31 (Fed. Cir. 1994), *cert. denied*, 516 U.S. 1070, 116 S. Ct. 771 (1996).

In sum, the jury's verdict regarding the inventorship issue is adequately supported by the evidence in the record.

### 8.    Inequitable Conduct

In its motion, Cargill also challenges the court's rejection of its claim of inequitable conduct on the part of the '793 inventors, as well as the jury's finding upon which that determination was predicated.

The defense of patent unenforceability, based upon inequitable conduct, is "entirely equitable in nature, and thus not an issue for a jury to decide."  *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed. Cir. 2000).  When addressing a claim of inequitable conduct based upon a patentee's failure to disclose information to the patent examiner, the court must focus upon whether 1) information not revealed was material and, additionally, 2) in failing to communicate the

---

[14]    As Sears notes, Bodycote would not properly have been listed as an inventor on the '793 patent since "only natural persons can be 'inventors.'"  *Beech Aircraft Corp. v. Edo Corp.*, 990 F.2d 1237, 1248 n. 23 (Fed. Cir. 1993).  There was no evidence adduced at trial as to which Bodycote Ortech employee, Cargill maintains, should have been named as an inventor on the '793 patent.

information, the inventors intended to deceive or mislead the PTO.  *See*

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).

Unenforceability based upon inequitable conduct must be proven to the

court's satisfaction by clear and convincing evidence.  *Seiko Epson Corp.*

*v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1367 (Fed. Cir. 1999).

Confronted with Cargill's claim of inequitable conduct, I followed the

procedure outlined in *Herman v. William Brooks Shoe Co.,* No. 95 CIV.

1324, 1998 WL 832609, at *5 (S.D.N.Y. Dec. 1, 1998), initially asking the

jury, in an advisory capacity, to address the threshold questions of

materiality and intent to deceive, with the aim of determining, based upon

the jury's findings and after weighing the questions of materiality and

intent to deceive, whether the patent should be declared unenforceable

based upon inequitable conduct.

In its verdict the jury found that material and non-cumulative

information, to the effect that Caliber – a product similar to that disclosed

in the '793 patent – was being offered for sale and had in fact been sold,

was known to the inventors prior to issuance of the patent and should

have been disclosed to the PTO, but was not.  The jury went on to find,

however, the lack of any intent on the part of inventors Wood and Hartley

to deceive the PTO by their failure to disclose their awareness of the
Caliber product sales.  Based upon those findings, and particularly the
absence of any intent to deceive – which finding is well supported by the
record – I concluded that the patent was not unenforceable on the basis of
inequitable conduct.  *See* Decision and Order dated April 12, 2005 (Dkt.
No. 358) at 29.  Having reviewed the record in light of Cargill's arguments,
I find no basis to set aside my ruling on this defense.

### 9.    Equitable Ownership By SEACO

In its motion Cargill argues that SEACO, which benefitted from the
jury's verdict on the patent-related counterclaim only to the extent of the
imposition of equitable relief, did not own the '793 patent and thus lacked
standing to sue under the patent.[15]

As I noted in my earlier post-trial decision, from a purely corporate
law point of view SEACO and Sears Petroleum are unquestionably distinct
entities.  Nonetheless, SEACO, Sears Petroleum and Sears Oil are

---

[15]    Prior to trial, Cargill's contention in this regard was restricted to its
contention that SEACO lacked standing to pursue claims for infringement of the '793
patent.  At trial, however, Cargill expanded the scope of its standing argument
considerably by maintaining, remarkably, that in treating SEACO as an equitable
owner of the '793 patent the Sears parties had essentially extinguished the ownership
interest of Sears Petroleum, thereby stripping it of the right to sue for and recover
damages for infringement of the claims of that patent.

significantly intertwined, with considerable commonality of officers and personnel, including David Wood, as well as ownership. SEACO is a wholly owned subsidiary of Sears Petroleum, and the two companies file a single, combined tax return.

During the course of the trial SEACO, while not allowed to recover damages, was permitted to participate in the pursuit of the patent infringement counterclaims and to enjoy the benefit of the equitable relief entered by the court, based upon the jury's finding of infringement. My decision to permit SEACO's pursuit of those claims was in recognition of the fact that equitable title to a patent has been recognized by the Federal Circuit to exist in circumstances involving "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.3 (Fed. Cir. 1991) (citation and internal quotation marks omitted). The jury's verdict in this regard, as well as the court's entry of injunctive relief on SEACO's behalf in connection with the '793 patent claims, were therefore appropriate.[16]

---

[16]     This is yet another example of an issue raised and argued on numerous occasions by Cargill that, in the end, was of no legal significance. Whether or not SEACO, as an equitable owner of the patent, qualified for equitable relief in addition to Sears Petroleum, does not affect either Cargill's liability for damages or the entry of

10.  Lost Profits

In its motion, Cargill also complains regarding the jury's finding of lost profits, arguing that the requirements for recovery of lost profits under such cases as *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978), were not met.

In my prior decisions I have fully articulated why, given the unique nature of this case and the fact that Sears and Cargill are not direct competitors, I did not regard this case as conforming neatly to the *Panduit* model. It is neither necessary nor desirable to address this issue further, particularly, since – much to Sears' chagrin – the jury's lost profit award did not factor into the judgment ultimately entered.

Cargill also registers complaints concerning the jury's calculation of a reasonable royalty rate of $.1875 per gallon of ClearLane Liquid, equivalent to $1.50 per ton of ClearLane Treated Salt based upon the formula utilized by Cargill to manufacture that product. That royalty amount, which was half of the amount sought as a reasonable royalty by the Sears parties at trial, was the product of evidence which included

---

equitable relief enjoining its continued infringement of the patent.

51

competing expert opinions, and is supported by the record.[17]

### D.   Cargill's Motion for JMOL on Common Law Counterclaims

In addition to its challenge of the jury's verdict on the Sears parties'

patent claims, Cargill also challenges portions of the jury's findings and

the court's judgment involving the various common law counterclaims

asserted by the Sears parties.

### 1.   Trade Secret Misappropriation

#### a)   Conversion of Breach of Contract Claim Into Tort Claim for Misappropriation of Trade Secrets

In its motion, Cargill asserts that the Sears parties' misappropriation

of trade secrets claim is nothing more than a breach of contract cause of

action which cannot, under either New York or Minnesota law,

independently form a basis for tort liability.  In response, Sears counters

by noting the distinguishing features of the breach of contract and

misappropriation of trade secret claims.  Because the misappropriation

cause of action is independent from, and springs from a separate, distinct

---

[17]   In its motion addressed to the various patent-related issues, Cargill also complains of the court's use of the prime rate of interest to calculate prejudgment interest, urging instead reliance upon the U.S. Treasury Bill rate.  Since this is a matter entrusted to the court's discretion, and there is case law supporting the use of the prime rate, *see, e.g.*, *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983), this argument will not be addressed further.

legal duty, the claims are neither co-extensive, nor are they mutually exclusive.

It is true, as Cargill argues, that breach of contract and misappropriation of trade secret claims that are truly identical causes of action, though asserted under two different labels, cannot co-exist. *Medinol Ltd.* v. *Boston Scientific Corp.*, 346 F. Supp.2d 575, 606-07 (S.D.N.Y. 2004). To prevail simultaneously on both tort and breach of contract theories, based upon a common set of facts, a plaintiff must demonstrate that the two claims are sufficiently distinct. *Id.* It does not follow, however, that such claims can never co-exist; "[m]isappropriation of trade secrets is an independent tort which is not grounded solely in the contractual relationship between the parties, but rather exists independently of the parties' contractual obligations." *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp.2d 283, 304 (S.D.N.Y. 2003) (citing*, inter alia*, Restatement of Torts § 757 (1939)). Indeed, it would be difficult to imagine how, under Cargill's theory, the two would not always coalesce whenever the misappropriation theory is premised upon a defendant's acquisition of the confidential information involved through breach of an agreement.

"It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.  This legal duty must spring from circumstances extraneous to and not constituting elements of, the contract, <u>although it may be connected with and dependent upon the contract.</u>"[18]  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 516 N.E.2d 190, 193-94, 521 N.Y.S.2d 653, 656-57 (1987) (emphasis added; internal citations omitted).  In this instance the two claims, while clearly interrelated and to some degree mutually dependent, are sufficiently separate and distinct as to allow them to co-exist.  The confidentiality agreement imbued information exchanged during the August, 1999 meeting with confidentiality, and precluded unauthorized disclosure of that information.  The tort of misappropriation, on the other hand, served to protect against Cargill's misappropriation of that information to its own commercial benefit, to the detriment of Sears.  Under these circumstances the jury's verdict finding liability on both theories will be allowed to stand.

---

[18]     Under New York law, which I have found applicable to this and various other counterclaims, to establish a claim of trade secret misappropriation a party must prove, *inter alia*, that the accused party used the trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery through improper means.  *See* pp. 54-55, *post.*

b)      Trade Secret Misappropriation Generally

In its motion Cargill complains initially of what it characterizes as a lack of proof on the question of precisely what trade secret is alleged to have been misappropriated, noting that it was incumbent upon Sears "to define or identify in detail" that information.[19]  *See Julie Research Labs, Inc. v. Select Photographic Eng'g, Inc.*, 810 F. Supp. 513, 519 (S.D.N.Y. 1992), *aff'd in part, rev'd in part on other grounds*, 998 F.2d 65 (2d Cir. 1993).

Under New York law, to prevail on a claim of misappropriation of trade secrets a claimant must show that it possessed a trade secret, and that it was obtained in breach of an agreement, confidential relationship, or duty, or as a result of discovery through improper means.  *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir. 1993) (citations omitted), *abrogated on other grounds*, *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 n.9 (2d Cir. 2000).  A trade secret includes any "formula, pattern, device or compilation of information

---

[19]      Plaintiff also complains that the court's jury verdict form did not require the jury to make a specific finding as to the exact nature of the trade secret found to have been misappropriated.  Leaving aside from the lack of any requirement that a verdict form request such specific information, this portion of Cargill's argument is waived by virtue of its failure to object to the jury verdict form on this basis. *See* Trial Transcript 3/3/05 (Dkt. No. 397) at 3184-91.

which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Bear, Stearns Funding, Inc.*, 361 F. Supp.2d at 304 (citing, *inter alia*, *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012-13, 604 N.Y.S.2d 912, 917-18 (1993)).

The proof at trial reflected that prior to the 1999 meetings between representatives of Sears and Cargill, David Wood and consultant Robert Hartley determined that by combining a low molecular weight carbohydrate derived from a refined and consistent source, such as cane molasses, together with a chloride salt, a synergistic freezing point depression can be realized. The evidence at trial also reflected that Sears invested a large amount of money, quantified as "upwards of $3 million dollars", in researching and developing information regarding this synergistic melting point phenomenon, and that at the time of the meeting the information had not been publicly disclosed, and was maintained by Sears in confidence.[20]

---

[20]    While the information was apparently disclosed later in a written communication to a New York State Department of Environmental Conservation representative, David Wood testified to his expectation that such a disclosure was confidential and not generally available to the public or competitors. In any event, that disclosure occurred in February of 2001, well after Cargill had developed and begun advertising the sale of its ClearLane products derived from Sears' trade secret

In support of the jury's finding of misappropriation, the evidence showed that after entering into the August 19, 1999 agreement, at Cargill's insistence, governing the exchange of confidential information and restricting its dissemination, Wood disclosed to Cargill representatives the Bodycote Ortech findings, reported in December of 1998, concerning the synergistic effects of combining low molecular weight carbohydrates with chloride salts, as well as exploration of cane molasses as a potential refined and consistent source of the desired carbohydrates.  Given the jury's apparent determination that this information constituted a trade secret protectable under New York law, the jury's finding of liability on that claim is thus supported by the evidence.

c)      <u>Trade Secret Ownership</u>

In its motion Cargill also takes issue with the court's charge that Sears, as a possessor but allegedly not the owner of the relevant trade secret, enjoyed the requisite standing to sue for misappropriation.  The essence of Cargill's argument in this regard is its contention that the court should have charged that it was necessary for Sears Petroleum to prove ownership of the trade secret in question, and that in reality the trade

―――――――――――

information.

secret at issue belonged to Sears Oil Company.

In the relevant portion of my charge, I instructed the jury that under New York law, a party claiming misappropriation of trade secrets was required to prove that the party possessed a trade secret. This charge comports with New York law as construed by both federal and state courts. *See*, *e.g.*, *Bear-Stearns Funding, Inc.*, 361 F. Supp.2d at 304-05; *Medinol Ltd.*, 346 F. Supp.2d at 607; *Sylmark Holdings Ltd. v. Silicone Zone Int'l, Ltd.*, 5 Misc.2d 285, 297, 783 N.Y.S.2d 758, 770-71 (Sup. Ct. N.Y. Cty. 2004)); *see also Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp.2d 157, 168 (S.D.N.Y. 1998) ("Standing to assert a cause of action for unfair competition under New York law requires pleading of facts 'supporting a colorable property or pecuniary interest.'") (quoting *Berni v. Int'l Gourmet Rests. of Am.*, 838 F.2d 642, 648 (2d Cir. 1988)).

Without question, there are cases in which the question of who owns a trade secret is of critical significance. *See* James Pooley, Trade Secrets § 5.01 (2005). The issue of trade secret ownership takes on importance, for example, in the licensing arena, since a prospective licensee is entitled to assurance of adequate protection upon entering into such a license. *Id.* The question of trade secret ownership can also arise

58

under circumstances involving competing claims of entitlement to protect and enforce a trade secret.  *See*, *e.g.*, *Pullman Group, LLC v. Prudential Ins. Co., of Am.*, 288 A.D.2, 3-4, 733 N.Y.S.2d 1, 1-2 (1st Dept. 2001) (dispute between employer and former employee now in competition, both claiming entitlement to enforce trade secret).

This, however, is not such a case.  In this instance the question of trade secret ownership as between two closely aligned corporate affiliates presents nothing more than another unnecessary distraction, and is not critical to the right of Sears Petroleum to enforce the trade secret or the jury's verdict in its favor.  *Cf. Business Trends Analysts v. Freedonia Group, Inc.*, 650 F. Supp. 1452, 1458 (S.D.N.Y. 1987) (rejecting argument that the plaintiff lacked standing to enforce the trade secrets at issue based upon proof that it had been granted exclusive use of the trade secrets).  Simply stated, Sears Petroleum, as an entity with legitimate, non-transitory possession of the trade secret information at issue, did have standing to enforce a trade secret in question, and the jury was properly instructed regarding this element of its trade secret misappropriation claim.[21]

---

[21]    In the event that an appellate court agrees with Cargill and finds that under New York law trade secret ownership, as distinct from possession, is required in

## 2.    Unfair Competition Claim

Cargill next asserts the jury's verdict finding that it engaged in unfair competition with Sears Petroleum cannot stand.  Cargill bases this argument both upon its contention that a claim for unfair competition cannot co-exist in this case with defendant's breach of contract claim, and that in any event the evidence does not support a finding of unfair competition.

The *sine qua non* of the tort of unfair competition is the misappropriation of the results of the labor, skill and expenditures of another, in bad faith.  *Louis Capital Mkts., L.P. v. Refco Group Ltd., LLC*, No. 601028/04, N.Y. Slip Op. 25239, 2005 WL 1473944, at *3-*4 (Sup. Ct. N.Y. Cty. June 6, 2005).  Among the ways in which unlawful unfair competition can occur is through the misappropriation of a trade secret. *Beverage Mktg. USA, Inc. v. South Beach Beverage Co.*, 2005 N.Y. Slip Op. 05881, 2005 WL 1635117, at *1 (2d Dept. July 11, 2005); *Louis*, 2005 WL 1473944, at *3-*4.  Addressing defendants' unfair competition

---

order to support a claim of trade secret misappropriation, any such error was harmless. The testimony at trial, including uncontradicted testimony of David Wood, convincingly established Sears Petroleum's ownership of the trade secret, and that the advances made by Sears Oil to finance development of the product represented nothing more than loans which were treated as such in internal company financial documents.

counterclaim, I instructed the jury that if a party misappropriates the results of the labor, skill and expenditures of any party in bad faith, that party may be liable for unfair competition. I went on to state that unfair competition could occur through bad faith misappropriation of a trade secret. Cargill did not take exception to this instruction.

The evidence in this case fully supports the jury's finding of unfair competition in this case, through its misappropriation of the Sears parties' trade secret information gleaned from the August, 1999 meeting and subsequent use of that information to its commercial benefit, and to the detriment of Sears. The evidence firmly establishes that following those meetings Cargill, who up until then had been unsuccessful in its efforts to develop a pre-wetting agent for use on its rock salt de-icing product which would not exhibit the same detrimental tendencies as previously available de-icers, shifted its course and focused upon utilization of cane molasses as a source of low molecular weight carbohydrates. This evidence amply supports the inference, which the jury obviously drew, that this marked shift in the emphasis of Cargill's research was a direct result of its having obtained and misused confidential information shared during the course of

the August, 1999 meeting.[22]

### 3.   Breach of Contract

In its motion, Cargill also seemingly challenges both the court's instructions and the jury's finding in connection with the Sears parties' breach of contract counterclaims.  As part of its argument, Cargill again challenges the failure of the court to require the jury to identify on its verdict form the specific confidential information disclosed in breach of the parties' August, 1999 confidentiality agreement, as well as the date of disclosure.  Cargill also argues that no reasonable jury could have found that the information disclosed during the August, 1999 meeting was confidential, and not publicly available or in any event disgorged during the July, 1999 meeting, at a point in time when there was no confidentiality agreement in place.

Cargill initially characterizes the court's jury instructions regarding breach of contract as "flawed," though it does not identify the flaw in those instructions.  When addressing the breach of contract claim, I instructed

---

[22]      In arguing that the unfair competition finding and resulting award are duplicative of the breach of contract award and should not stand, Cargill ignores the fact that the jury's award of damages for unfair competition, in the amount of $355,422, was expressly pronounced by the jury as being duplicative of the amount awarded for breach of contract, and thus did not directly factor into the monetary component of the court's judgment.

the jury in accordance with generally accepted Minnesota pattern instructions regarding breach of contract.[23]  Plaintiff registered no objections to the court's instruction regarding breach of contract.  *See* Trial Transcript 3/3/05 (Dkt. No. 397) at 3184-91.  Accordingly, whatever defect Cargill may now be asserting with regard to those instructions has been waived, and cannot be relied upon in support of its motion for a new trial.  *Denny v. Ford Motor Co.*, No. 88-CV-1180, 1993 WL 219759, at *5 (N.D.N.Y. June 15, 1993) (McAvoy, C.J.) (citing Fed. R. Civ. P. 51), *aff'd*, 79 F.3d 12 (2d Cir. 1996).

After being charged in succinct terms regarding the elements of a breach of contract claim, and having been provided with the contract, which is direct and concise in its terms, the jury found that Cargill had in fact breached its obligations under that agreement.  Based upon the evidence at trial the jury obviously found, despite Cargill's musings otherwise, that Sears in fact did confide in Cargill by disclosing confidential, trade secret information during the August, 1999 meeting which had not previously been either publicly available or disclosed in the

---

[23]  In light of the parties' choice of law provisions set forth in the contract, I previously determined that Minnesota law should govern the Sears' breach of contract counterclaims.  *Cargill*, 334 F. Supp.2d at 245.

earlier, July session.[24]

In sum, the jury's instruction, coupled with the verdict sheet made available to the jury for its use, appropriately described the elements of a breach of contract claim, and the jury's finding that Cargill did breach its written agreement with the Sears parties is amply supported by the record.

### 4. SEACO's Unjust Enrichment Claim

By its verdict, the jury found that Cargill was unjustly enriched, at the expense of SEACO, as a result of having received and benefitted from the knowledge imparted during the August, 1999 meeting. Cargill challenges this finding, urging the court to recognize the corporate distinction between Sears Petroleum, which disclosed the information regarding its use of cane molasses in developing a de-icing agent during that meeting, and SEACO, its subsidiary.

The elements of an unjust enrichment cause of action are not controversial, and are easily stated. "To prevail on a claim of unjust

---

[24]    One wonders why, if, as Cargill asserts, the technology now at issue was publicly available in August of 1999, the '793 patent was issued two years later, signifying a determination that at the point the technology was neither obvious nor anticipated by prior art. The argument of public availability is also undermined by Cargill's inability, prior to August of 1999, to take advantage of this allegedly available technology in order to develop its ClearLane Treated Salt products earlier.

enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citing and quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)); *Clark v. Daby*, 300 A.D.2d 732, 732, 751 N.Y.S.2d 622, 623 (3d Dept. 2002).  The law of unjust enrichment seeks to compensate a party when another has received money or benefit at its expense. *Kaye*, 202 F.3d at 616 (citing *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 906, 685 N.Y.S.2d 381, 382 (4th Dept. 1999)).

By its verdict the jury obviously found that SEACO, which had been poised to manufacture and market a de-icing product utilizing the '793 patent technology, should equitably be compensated as a result of the benefit derived from Cargill from the disclosure of that technology and SEACO's marketing efforts.  While Cargill claims that this finding ignores the corporate separateness of the two Sears entities, there is evidence in the record to support the jury's finding.

During his testimony, David Wood described SEACO and recounted its efforts to develop and market agricultural-based de-icing products, describing SEACO's role as that of the sales arm of the Sears business.

*See* Trial Transcript 2/17/05 (Dkt. No. 364) at 1589-90.  SEACO, a wholly

owned subsidiary of Sears Petroleum, was created when the Sears

companies decided to branch out into the de-icing industry; its status as a

separate entity was maintained for the purpose of internally differentiating

between the finances of the oil business and the de-icing business.  *Id.* at

1436-37.  The role of Wood, who disclosed the patented technology

during the August, 1999 meeting to Cargill, extended to being an officer of

both Sears Petroleum and SEACO.  Cargill's subsequent manufacture

and sale of ClearLane, a molasses-based de-icer, in 2000 allowed it to

take advantage of a market SEACO assisted in developing, and receive

the benefit of both those marketing efforts and the '793 technology

disclosed by David Wood during the meeting.

In light of the close relationship between Sears Petroleum and

SEACO, including the significant overlap of both officers and employees

and otherwise, the jury's verdict in favor of SEACO on its unjust

enrichment claim is supported by the evidence adduced at trial.

5.    <u>Award of Common Law Damages as Duplicative</u>

_____In its verdict, the jury found Cargill liable to Sears Petroleum for both

misappropriation of trade secrets and breach of contract, awarding Sears

$195,905 and $355,422 in damages on those two claims, respectively.

Urging the non-controversial principle that a party may be compensated

only once for a single injury which gives rise to two or more causes of

action providing for a legal theory of compensation, *see Bender v. City of*

*New York*, 78 F.3d 787, 793 (2d Cir. 1996); *see also Conway v. Icahn &*

*Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994), Cargill maintains that the jury's

awards on those two claims cannot co-exist.

When confronted with a claim of inconsistency in a jury verdict, a

court should generally strive to interpret that verdict in a manner that

allows for reconciliation of the challenged portions and, wherever possible,

upholds the jury's verdict.  *Turley v. Police Dept. of City of New York*, 167

F.3d 757, 760 (2d Cir. 1999) (citations omitted).  It is against the backdrop

of this overarching consideration that the jury's verdict with regard to these

two common law claims must be analyzed.

The jury in this case was instructed to exercise care to ensure

against duplicative or overlapping damage recoveries.[25]  In addition,

_____

[25]    When charging the jury, I instructed it as follows regarding the award of
damages on the multiple claims presented:

> As by now should be obvious to you, Sears
> Petroleum and Seaco have asserted multiple claims against
> Cargill, claiming potentially overlapping damages.  In

immediately following various of the damage questions on the jury verdict

form, including the two in issue, the jury was asked whether any amount

listed was duplicative of amounts awarded under different legal theories.

Addressing those inquiries, the jury responded that none of the amount

awarded as damages for misappropriation of trade secrets was included

in any amount previously awarded, though the breach of contract award

was included in the earlier unfair competition award.  *See* Verdict Form

(Dkt. No. 331) Nos. 20, 28.

Despite Cargill's argument to the contrary, I am unable to conclude

that the awards of damages on the breach of contract and the

misappropriation of trade secret claims are hopelessly duplicative or

overlapping under any interpretation of the jury's verdict.  With regard to

trade secret misappropriation the jury was instructed, *inter alia*, that it

"may only award an amount that would fairly compensate Sears

---

> awarding damages on multiple claims you should not award
> compensatory damages more than once for the same
> injury.  A party is entitled to be made whole, but is not
> entitled to recover more than once for the same loss.  Of
> course, if different injuries are attributed to the separate
> claims, then you must compensate the party fully for all of
> the injuries suffered.

Trial Transcript 3/3/05 (Dkt. No. 397) at 3263.

Petroleum and SEACO for damages proximately caused by Cargill's use of misappropriated trade secrets, if any." Trial Transcript 3/3/05 (Dkt. No. 397) at 3270.  Elaborating on the types of damages which could be awarded, I noted that "[i]n awarding such damages, [the jury] may consider the cost Cargill would have incurred in acquiring the same trade secret information through its own experimentation or through other lawful means, or . . . [could] consider the actual value of what has been appropriated or the reasonable royalty as of the time of the misappropriation." *Id.* at 3270-71.

Instructing on the measure of damages awardable for breach of contract, I charged the jury that "[t]he general measure of damages for breach of contract is the amount that will place the nonbreaching party in the same position as if the contract had been fully performed, provided that the parties could, when they entered into the contract, have foreseen that such damages would probably result if the contract was breached." Trial Transcript 3/3/05 (Dkt. No. 397) at 3275.  The confidentiality agreement at the heart of defendants' breach of contract counterclaim provided, among other things, that confidential information disclosed to Cargill by Sears would remain the property of the Sears parties, and that

69

"all inventions (including discoveries, ideas, or improvements, whether patentable or not), which are conceived or made during or after the term of this Agreement and are derived or result from or in any way utilize [the Sears parties'] Confidential Information, shall belong to [the Sears parties]."  Young Decl. Vol. II (Dkt. No. 381) Exh. 28, § 10.  The jury's verdict, construed in light of these considerations, is susceptible to a rational interpretation that the $195,905 awarded on the misappropriation of trade secrets claim represented the value of the wrongly taken property, measured in terms of the expense which Cargill would have incurred in developing the same technology, whereas the $355,422 was awarded to compensate defendants for Cargill's exploitation of that property.  Viewed in this light, the jury's award on these two claims was not improperly duplicative.

### 6.    Award of Common Law Damages as Speculative

In addition to raising the claim of overlap or duplication in recoveries, Cargill challenges the jury's awards of $355,422 for unfair competition in favor of Sears and $167,700 to SEACO on its finding of unjust enrichment, claiming that those awards were unduly speculative.

The burden of proving damages in connection with a common law

70

cause of action for unfair competition in New York rests with the plaintiff. *See Gardinier v. Gendel*, 727 F.Supp. 799, 805 (E.D.N.Y. 1989), *aff'd*, 976 F.2d 746 (Fed. Cir. 1992) (unpublished).  The failure of a plaintiff to prove damages associated with allegedly unlawful conduct will ordinarily result in dismissal of the claim, damages generally being regarded as an essential element of such a claim.  *Id.*  In the event a jury confers damages based upon a particular cause of action, that award must garner evidentiary support from the record, and may not be unduly speculative.  *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F.Supp.2d 492, 502-03 (S.D.N.Y. 2002).  New York law does not, however, require that party prove the amount of its losses with mathematical precision, instead demanding only as much accuracy as circumstances permit.  *Id.*

At trial the jury was provided with evidence, both documentary and in the form of testimony, regarding the level of Cargill's sales of its ClearLane Treated Salt, utilizing the accused ClearLane Liquid products. Michael Hoerle, a key Cargill management employee, testified at length regarding the sales figures and profit margins associated with ClearLane Treated Salt.  Trial Testimony 2/15/05-2/16/05 (Dkt. Nos. 263-64) at1142-52, 1202, 1210-21; *see also* Defendants' Exhibits 49, 221, 340.  The jury's

71

apparent choice to apportion its award and resulting determination that

twenty percent of the sales of infringing products occurred prior to

issuance of the '793 patent is therefore not wholly speculative and without

foundation.  While it is true that Professor Colin Blaydon, Sears' damage

expert, did not specifically address the issue of damages accruing prior to

issuance of the '793 patent, there is no requirement that a jury's damage

award be supported by expert testimony, provided that the record contains

sufficient evidence to allow calculation of damages without undue

speculation.  *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F.

Supp.2d 604, 607-08 (S.D.N.Y. 2002), *aff'd*, 92 Fed. Appx. 812 (2d Cir.

2004) (unpublished).

The jury's award of $167,700 to SEACO as its compensation for

unjust enrichment is equally defensible.  While the mathematics

associated with the jury's arrival at that figure are not readily apparent, the

damages experienced by SEACO in connection with this claim relate to

the reasonable value of the benefit conferred upon Cargill.  That benefit

ties directly into profits derived from Cargill's sale of products utilizing the

accused ClearLane Liquid, and as such the jury had before it ample

evidence to arrive at a proper damage figure on that cause of action as

well.  Accordingly, I decline Cargill's invitation to set aside the jury's

damage award on these claims as unduly speculative.  *See Gentile v.*

*County of Suffolk*, 926 F.2d 142, 153-54 (2d Cir. 1991).

### 7.    Grant of Specific Performance

In its post-trial motion Cargill challenged the court's specific

performance directive, requiring transfer by Cargill of its title to U.S. Patent

No. 6,398,979 (the "'979 Patent).  Cargill argues that by suing for

damages under the August, 1999 contract, Sears has elected its remedies

and should now be precluded from seeking specific performance.

Additionally, Cargill contends that by conferring the benefit of both specific

performance and damages, the court has essentially afforded Sears a

windfall, double recovery.

The issues now raised by Cargill were fully briefed following trial and

prior to the entry of judgment.  My reasoning for rejecting Cargill's

arguments and requiring the transfer of the '979 patent was fully

articulated in an earlier determination.  *See* Decision and Order dated

April 12, 2005 (Dkt. No. 358) at 36-40.  For the reasons set forth in that

decision, I deny the portion of Cargill's post-trial motion addressing this

issue.

### 8.   Modification of Prejudgment Interest Rate

In its motion, Cargill objects to employment of New York's statutory

rate to calculate prejudgment interest on the breach of contract award.

Cargill argues that because the contract under which the damages were

awarded specifies that Minnesota law should apply, interest on the

$355,422 component of the jury's verdict should have been computed

utilizing the one year treasury bill rate, and on a simple interest basis, as

that state's laws provide.

In support of its contention that Minnesota law should control the

award of prejudgment interest on the jury's award of $355,422, Cargill

cites *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604

(2d Cir. 1996).  *Valley Juice* stands for the noncontroversial principle that

the calculation of prejudgment interest on a breach of contract claim

should be governed by any choice of law provision contained within the

agreement.  Even that case, however, recognizes a distinction between

application of the choice of law provisions of a contract to claims for

breach of contract, and tort causes of action which do not arise under,

though they may have a relationship to, a contract.  87 F.3d at 611.  In

this case the jury's award for unfair competition, which I found should be

based upon New York law, was deemed to control with regard to the

$355,422 also awarded on the contract claim, based upon the jury's

finding that the damage awards overlap.  As such, *Valley Juice* does not

compel application of Minnesota law in calculating prejudgment interest on

that claim.

### E.    Sears' Motion For Enhanced Damages

_____In their motion, the Sears parties have asked that I award enhanced

damages under 35 U.S.C. § 284, despite the jury's finding that Cargill's

infringement was not willful.  In support of that request, defendants urge

Cargill's alleged bad faith, including though not limited to its vexatious

litigation conduct, as a basis for making such an award, and have

requested that the infringement damages awarded by the jury be

enhanced to the maximum extent allowable by statute – that is, that they

be trebled.  In the event of a finding by the court that a jury determination

of willfulness is a necessary predicate to enhancement of damages, Sears

alternatively seeks a new trial on that issue.

Section 284 of the Patent Act authorizes a court, in its discretion, to

"increase the damages [awarded to compensate for infringement] up to

three times the amount found or assessed[.]"  35 U.S.C. § 284; *see*

*Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1569-70 (Fed. Cir. 1996).  "A decision of whether to enhance damages under section 284 is committed to the discretion of the trial judge and will not be disturbed absent a clear showing of abuse of discretion."  *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183 (Fed. Cir. 1994).  Relegation of the question of enhancement to the court, rather than a jury, recognizes that "[t]he trial judge is in the best position to weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser."  *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).  Unfortunately, however, the statute is silent as to the criteria for making such an enhancement, leaving the courts to their own devices to determine when enhancement is appropriate.  *Sharper Image Corp. v. Honeywell Int'l Inc.*, 222 F.R.D. 621, 629 (N.D. Cal. 2004).

Implementing section 284, the courts have generally developed a two step approach.  While no specific showing of intent is needed to support a finding of infringement and recovery of ordinary, compensatory damages under section 284, *see Jurgens*, 80 F.3d at 1570 n.2, a

determination of some measure of culpability on the part of the infringer is required for enhancement of damages.  *See Jurgens*, 80 F.3d at 1570; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-28 (Fed. Cir. 1992).  In the event of a finding that the infringer acted with the requisite degree of blame the trial court may, though is not required to, increase damages based upon the totality of the circumstances.  *Read Corp.*, 970 F.2d at 826-28; *see also Sharper Image Corp.*, 222 F.R.D. at 629-30.

In its motion Sears implores the court to award enhanced damages based upon Cargill's abhorrent behavior, both related to its infringing activities and tied to its litigation strategy.  Sears cites several examples, many of which fall within the categories specifically enunciated in *Read*, of conduct which, it maintains, justify the imposition of such an award.  Sears begins by recounting Cargill's development of its ClearLane line of products, utilizing technology imparted to it under the protection of a confidentiality agreement.  Sears also cites the limited nature of the opinion obtained from counsel to support Cargill's continued infringing conduct, and particularly the fact that the opinion was expressly made subject to a condition which Cargill knew could not be met.  Sears additionally points to the disparity in the size of the parties and the

extensive financial resources at Cargill's disposal.  Finally, Sears attacks
Cargill's litigation conduct noting, for example, that while at trial the
defendants were precluded from addressing the relative size of the
parties, Cargill took great liberties to appeal to the jurors and taint the
Sears parties in their eyes by portraying them as unduly litigious.

It is true, as Sears suggests, that various courts have referred to the
measure of intent, or culpability, required to support an award of
enhanced damages in various ways, including by use of the term "bad
faith".  *See*, *e.g.*, *King Instruments Corp. v. Perego*, 65 F.3d 941, 947
(Fed. Cir. 1995) ("The Patent Act also includes enhanced damages for
willful infringement or bad faith and for attorney fees."), *cert. denied*, 517
U.S. 1188, 116 S. Ct. 1675 (1996); *Hilton Davis Chem. Co. v. Warner-
Jenkinson Co., Inc.*, 62 F.3d 1512, 1519 (Fed. Cir. 1995) (proof of bad
faith by an infringer may entitle the patent owner to enhanced damages
and attorney fees for willful infringement), *overruled on other grounds by*
520 U.S. 17, 117 S. Ct. 1040 (1997); *see also Fuji Photo Film Co., Ltd. v.
Jazz Photo Corp.*, 394 F.3d 1368, 1379-80 (Fed. Cir. 2005) (bad faith
infringement defense rejected as not having been presented to the trial
court).  Employment of the term "bad faith" in that setting is unfortunately

misleading, given that the term is imbued with various meanings under the Patent Act. *Jurgens,* 80 F.3d at 1570-71.  Bad faith, for example, can be used in reference to misconduct in connection with prosecution of a patent, or with respect to patent litigation. *Id.*  Such acts alone, however, are insufficient to justify enhancement of infringement damages under section 284.

The key ingredient to enhanced damages is the requirement that the infringer acted with some degree of fault, bearing directly on the infringement, rather than relating to ancillary matters such as litigation conduct. *Jurgens*, 80 F.3d at 1571; *Sharper Image*, 222 F.R.D. at 629-31. The question of whether this threshold level of culpability – however it is characterized – has been met is a question of fact for a jury, and not the court.  Absent a jury finding of that requisite degree of blame which would support enhanced damages, the court is powerless to render such an award. *Sharper Image*, 222 F.R.D. at 629.  As the Federal Circuit has noted, "if the jury finding is that willful infringement did not occur and that finding is not overturned on a motion for JNOV, no basis for assessing increased damages for willful infringement exists[.]"  *Shiley, Inc. v. Bentley Labs., Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986), *cert. denied*, 479 U.S.

1087, 107 S. Ct. 1291 (1987).

The Sears parties have not sought JMOL setting aside the jury's finding that Cargill's infringement was not willful.[26]  Instead, in apparent recognition that the court might adopt the position that a finding of willfullness is a necessary predicate to enhancement of damages, Sears requests a new trial on the question of willfulness.

In the patent infringement setting, willfulness may be found where it is demonstrated the infringer acted in disregard of a patent and had no reasonable basis for believing it had a right to act as it did.  *See SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1464-65 (Fed. Cir. 1997); *Electro Med Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1056 (Fed. Cir. 1994).  In judging whether a party's infringement was willful, a jury must determine "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed."  *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1428 (Fed. Cir. 1988).

After a party receives actual notice of another's rights to an issued

---

[26]    At trial, Cargill sought JMOL with respect to the Sears' parties claim of willful infringement.  That motion was denied, and an explanation for that denial was set forth, in my earlier post-trial decision.  *See* Decision and Order dated 4/12/05 (Dkt. No. 358) at 21-26.

patent, that party is charged with an affirmative duty to act with due care. *Read Corp.*, 970 F.2d at 828; *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992); *Underwater Devices Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983).  The appropriate point from which to assess willfulness is at the time the alleged infringer receives notice of the patent.  *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) (citations omitted); *see also State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1237 (Fed. Cir. 1985).

To be sure, there was ample evidence at trial which could have supported a jury's finding of willful infringement.  Among the circumstances suggestive of willfulness was the extremely limited nature of the attorney opinion sought by Cargill to insulate its infringing conduct, as well as the fact that the letter ultimately received hinged upon a condition which it had reason to know could not be met.  A jury could have found that reliance upon that opinion letter was unreasonable under the circumstances.  *Read Corp.*, 970 F.2d at 828-30.  Willfullness also could have been found based upon the jury's obvious conclusion that Cargill took and used to its own advantage confidential information shared with it by representatives of the Sears parties pursuant to a confidentiality

agreement, leading to the development and marketing of plaintiff's ClearLane products.

The issue of willfulness, however, was entrusted to the jury based upon an instruction which was consonant with Federal Circuit authority, advising the jury of the factors which it could properly consider in deciding the question.  After a lengthy trial and period of deliberation, the jury concluded that the infringing conduct was not willful.  Having reviewed the matter in the light of Sears' arguments, I am not convinced that the jury reached a seriously erroneous result in this regard, or that its verdict represents a miscarriage of justice.  Accordingly, I find insufficient basis to disregard that finding and award Sears a new trial on the question of willfulness.  And, based upon my finding that a jury determination of willfulness is a necessary prerequisite to an award of enhanced damages, I deny the Sears parties' request for such relief.

F.    Sears' Application For Award of Attorney Fees

In their post-trial motions, the Sears parties have requested an award of attorney fees and non-taxable costs.  Cargill opposes that request, based principally upon the jury's finding that its infringing conduct was not willful, arguing that the case was close, and of necessity

vigorously litigated.

35 U.S.C. § 285 authorizes the court to award attorney fees in an exceptional case.[27]  35 U.S.C. § 285.  Before such an award may be made the court must first make a threshold determination that the case is "exceptional".  *Superior Fireplace Co. v. Magestic Prods. Co.*, 270 F.3d 1358, 1376 (Fed. Cir. 2001); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).  As that term implies, to justify an award of attorney fees the case must be truly unusual.  *Machinery Corp. of Am. v. Gullfiber AB*, 774 F.2d 467, 471 (Fed. Cir. 1985).  An award of attorney fees to a prevailing party under section 285 is unique to patent law, and not by any means automatic; instead, such an award a court must be predicated upon something beyond the fact that the patent holder has prevailed, something which distinguishes section 285 from many other statutory fee shifting exceptions to the "American Rule" that each litigant must bear its own litigation costs.  *Id.*

Although plainly there is significant overlap in the two, the requirements for enhancing damages under section 284 and awarding attorney fees under section 285 are not co-extensive.  *Jurgens*, 80 F.3d at

---

[27]     That section provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.

1574 n.4.  The exceptional case inquiry is focused heavily upon litigation conduct; "[e]xceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee procuring the patent." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) (citing *Cambridge Prods. Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050-51 (Fed. Cir. 1992)).  Accordingly, while bad faith and willfulness in connection with the underlying infringing conduct may support an exceptional case designation, *see Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346-47 (Fed. Cir. 2000), it is not a necessary prerequisite.  *Sensonics*, 81 F.3d at 1574.  As the Federal Circuit has noted, "[l]itigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional under § 285."  *Id.* (citing, *inter alia*, *Spectra-Physics Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1537 (Fed. Cir.), *cert. denied*, 484 U.S. 954, 108 S. Ct. 346 (1987)).

Factors which courts have considered in determining whether a case is exceptional, within the realm of section 285, include whether 1) the infringing conduct was willful or intentional; 2) the losing party engaged in inequitable conduct before the Patent and Trademark Office; 3) offensive

litigation tactics, including vexatious or unjustified litigation or frivolous

filings, were employed; and 4) the losing party litigated in bad faith.

*Superior Fireplace Co.*, 270 F.3d at 1377-78; *Brasseler, U.S.A. I, L.P.*,

267 F.3d at 1380; *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d

1473, 1481-82 (Fed. Cir. 1998).  "In assessing whether a case qualifies as

exceptional, the district court must look at the totality of the

circumstances."  *Yamanouchi Pharm. Co., Ltd.*, 231 F.3d at 1347.

Cargill does not dispute that Sears was a prevailing party in this

matter.  Indeed, with the exception of the jury's findings regarding

willfulness and the appropriateness of awarding punitive damages on the

Sears parties' common law counterclaims, the jury uniformly accepted

defendants' positions and rejected Cargill's various claims and defenses,

including of Cargill's non-infringement and patent invalidity.  Accordingly,

Sears is properly positioned to seek costs and attorney fees under section

285.

Several factors militate in favor of a finding of an exceptional case in

this instance.  Perhaps foremost is the jury's finding, implicit in its verdict

and supported by the evidence at trial, that Cargill, a dominant supplier in

the treated salt de-icing market that had previously been courted by Sears

to form a joint venture, copied and misappropriated to its own benefit the results of Sears' labors.  Struggling, prior to the 1999 meetings between representatives of the parties, to develop a pre-wetting agent for use in the sale of treated salt to municipalities and other commercial customers, Cargill radically altered its course immediately after learning at those meetings of the Sears parties' invention and their use of cane molasses to develop the desired synergistic freezing point depression effect.  Following disclosure of the results of Sears' testing and its focus on cane molasses as a source of the necessary low molecular weight constituent, Cargill embarked upon a new course of examining the use of cane molasses for that purpose, ultimately leading to the development of its infringing ClearLane products.  The copying of a patented invention can provide a basis for finding the requisite degree of bad faith necessary to declare an exceptional case.  *Sensonics*, 81 F.3d at 1574-75; *Cybor Corp.*, 138 F.3d at 1460.

In addition to activities associated with its infringement, Cargill's litigation conduct also provides ample basis for an award of damages.  Throughout the course of this proceeding Cargill has engaged in a strategy designed to drive up litigation expenses which, given its relative

size, it is in a much better position to absorb than the Sears parties.[28]

Throughout the course of litigation the court has been inundated by not

only the usual claim construction and summary judgment motions, but in

addition the filing of sixteen motions *in limine*, the bulk of those

attributable to Cargill, multiple litigation briefs and filings, and two rounds

of post-trial briefings.  In many of its submissions Cargill has pressed

arguments previously made and rejected by the court, often on more than

one prior occasion.  Many of the issues which have been raised by Cargill,

moreover, have had little or no actual or potential bearing upon the

ultimate outcome of the case.

The vexatiousness with which Cargill litigated this case is

exemplified by the fact that throughout the course of the litigation, literally

at every turn, Cargill has pressed its assertion that the '793 patent should

have listed Bodycote Ortech as an inventor, and that David Wood should

not have been listed as an inventor.  This is an issue which was

addressed and, the court thought, laid to rest in a pretrial memorandum

---

[28]    In its motion, the Sears parties estimate that they have incurred $2.5 million in direct litigation costs attributable to this action, in addition to the $304,000 in taxable costs sought in a bill of costs filed under Rule 54 of the Federal Rules of Civil Procedure.

decision addressing the issue.[29]  *See Cargill*, 334 F. Supp.2d at 233-36.

More fundamentally, as I pointed out to Cargill's counsel, the issue was in

the end meaningless, since the Patent Act affords a ready remedy to

rectify any such perceived deficiency, *see* 35 U.S.C. § 256, and as such

the improper naming of Wood or failure to name Bodycote Ortech

personnel as inventors on the '793 patent would not invalidate the patent

or provide a basis for setting aside a jury finding of infringement and

resulting award of damages.  Simply put, by asserting that Bodycote

Ortech should have been listed as an inventor on the '793 patent, even

though in its agreement with the Sears parties Bodycote agreed that

proprietary rights growing out of the parties' relationship would remain with

Sears, and has never contended otherwise, Cargill required Sears to

expend additional effort to defend against this claim, and the matter was

placed before the jury with an obvious intent to suggest that the Sears

parties and the '793 inventors acted improperly before the PTO, and not

for any genuine legal purpose in defending against the Sears parties'

infringement claims.

---

[29]     In its pretrial dispositive motions Cargill raised the issue of inventorship as an element of its equitable, unenforceability defense.  The issue was later recast as bearing upon the issue of invalidity, and was ultimately presented to the jury in that context.

There are many other examples of Cargill's overreaching litigation conduct. Throughout the course of the trial and in its post-trial motions Cargill has repeatedly challenged the claim, incorporated into the jury's findings, that under the doctrine of equivalents, Cargill's product infringed claims four, five, six and eight of the '793 patent.  Yet, during oral argument on the parties' post-trial motions Cargill's attorney candidly acknowledged that in light of the jury's findings of direct infringement in connection with the remaining claims, these additional findings of infringement under the doctrine of equivalents were of no legal significance, and whether or not the motion was granted would not affect the jury's verdict and award of damages.

Another example of an issue raised by the plaintiff with little or no legal significance was the question of SEACO's ownership of the '793 patent.  While defendants readily acknowledged that only Sears Petroleum, as assignee of the '793 patent, could recover damages, and in the end it made little difference as to which entity, as between Sears Petroleum and SEACO, was found entitled to recover those damages, since they both remain in existence and are closely aligned, Cargill insisted that SEACO could not appropriately participate in the infringement

portion of the litigation.  This issue was briefed on several occasions and addressed by the court in my pretrial ruling, *see Cargill*, Dkt. No. 87, at 3, and ultimately was presented to the jury for determination of whether SEACO should be regarded as an equitable owner of the '793 patent and thus entitled to equitable relief.  This is but another example of an issue that was raised, extensively briefed, and presented to the jury which, in the end, had no effect on the ultimate outcome of the case.

A further example of the conduct leading to my finding of this case as exceptional was Cargill's insistence on pressing a claim of inequitable conduct before the PTO on the part of the '793 inventors, despite the lack of any legal opinions supporting that charge.  The defense of inequitable conduct, described by the Federal Circuit as one seemingly "attached to every patent prosecution, diverting the court from genuine issues and simply spawning satellite litigation[,]" *Multiform Desiccants, Inc.*, 133 F.3d at 1482, "is not 'just another defense' to be routinely asserted in a patent infringement case", *Total Containment, Inc. v. Environ Prods.*, 921 F. Supp. 1355, 1406 (E.D. Pa. 1995) (citation omitted), *aff'd in relevant part*, 106 F.3d 427 (Fed. Cir. 1997).  The defense, obviously offered in support of its efforts to portray the Sears parties and the '793 inventors in a

90

negative light, was rejected by the court, based upon the jury's finding of no evidence of intent to deceive the PTO.

Throughout the course of the trial the court was also disappointed with the level of candor and responsiveness demonstrated by Cargill in its response to requests for the production of documents.  Literally, even during the course of the trial Sears was required to enlist the aid of the court in obtaining highly relevant documents regarding Cargill's ongoing sales of ClearLane Treated Salt for use in supporting its request for damages.

Another factor bearing upon the exceptional case inquiry is Cargill's selection of the Southern District of New York's venue for commencement of its declaratory judgment action.  Resisting the Sears parties' efforts for a transfer of the case from that venue – one notoriously expensive in which to litigate – Cargill went to lengths to minimize its connection with the Northern District of New York.  In its venue motion Cargill argued, through sworn declaration of Michael Hoerle, one of its key management employees, that "Sears has over-emphasized or misunderstood the relation to this case of Cargill's salt mine in Lansing, New York. . . . Lansing has no unique connection to ClearLane ®Treated Salt."  Dkt. No.

22, ¶ 6.  At trial, by contrast, Hoerle emphasized that local connection, testifying that Cargill mined its rock salt from "here in Lansing, New York, sixty miles south of here. . ." as well as two other locations, and that Lansing was the first of those involved in production of the ClearLane Treated Salt product.  Trial Transcript 2/15/05 (Dkt. No. 362) at 1134-35.

Perhaps the clearest example of litigation misconduct had as its genesis Cargill's commitment to produce Richard Rose, a Cargill management employee and key witness to the relevant events, to be called as a witness by the Sears parties, in return for the Sears parties' commitment to produce Robert Hartley, a Canadian non-party who is one of the inventors of the '793 patent.  After making that commitment Cargill did have Rose in court and available briefly during the early portion of the trial, but without any warning – and prior to his being asked to testify – he returned to California, allegedly to honor family and work commitments, and Sears was advised of this only after the fact.  Without assurance by Cargill that Rose would return, and after carefully reviewing the matter and soliciting necessary legal authority from the parties, I determined that a missing witness charge would be appropriate, and advised Cargill that such an instruction would be given unless Rose returned to testify.  It was

only after that notification that the promised witness was produced.[30]

While recognizing that the exceptional case is just that – something more than an ordinary, vigorously litigated case of patent infringement – I find that the facts of this case sufficiently warrant such a label.  In total, Cargill filed twenty-four contested motions, virtually all of which were substantially if not wholly denied.  Moreover, at every turn Cargill pressed and reiterated every conceivable argument in its favor, often with little or no legal or factual support.  Plaintiff's conduct, which can be fairly characterized as "a blatant attempt by a giant corporation to coerce a small company with few resources to abandon its patent suit" provides an adequate basis, indeed compelling justification, for declaring this an exceptional case.  *FMT Corp. v. Nissei ASB Co.*, No. 1:90-CV-786, 1993 U.S. Dist. LEXIS 19625, at *4 (N.D. Ga. Sept. 27, 1993).  Driven largely by the necessity of defending against unnecessary and extensive tactics by Cargill, a major corporation, the Sears parties were required to expend nearly $3 million to obtain a jury verdict which, in the end, barely equaled

---

[30]     In its defense, Cargill likens its refusal to honor the commitment to produce Richard Rose voluntarily with the situation that arose during the course of testimony by defendants' expert, Professor Bruce Nauman, who was permitted a one day hiatus in his testimony to attend to professional commitments.  These situations, however, bear no resemblance one to the other.

the amount spent.  Under these circumstances, it would be a grave

injustice to allow this result and condone the efforts of Cargill to bankrupt

the Sears parties by increasing the cost of litigation to a point where they

could not be endured.  *Id.*, at \*4-\*11.  "It is the judicial duty to refuse to

condone behavior that exceeds reasonable litigation tactics."  *Sensonics*,

81 F.3d at 1575.  Accordingly, based upon my determination that this

represents  an exceptional case, I will permit the Sears parties to make

application for an award of non-taxable costs and attorney fees under 35

U.S.C. § 285, and will afford Cargill a fair opportunity to oppose the

amounts requested on the basis they are not reasonable or otherwise

unrecoverable under section 285.

> G.     Sears' Motion To Amend the Judgment

In its third and final post-trial motion, Sears seeks alteration of the

judgment entered in the case in certain respects.  Seeking to maximize

the jury's verdict, Sears renews its request for inclusion of the $355,422

awarded by the jury as lost profits in connection with its patent

infringement claims into the judgment amount.  Defendants also ask that

the court revisit its interest calculation and compute interest on a monthly

basis, rather than annually.  Finally, the Sears parties request that the

court's stay of injunctive relief, pending appeal, be amended, and the amount of the required bond increased, to reflect changed economic conditions.

## 1.    Restoration of Lost Profit Award

As was explained in my decision issued on April 12, 2005, I found it appropriate in this case to instruct the jury – over Cargill's objection – that it could award lost profits as an alternative measure of patent infringement damages, in reliance principally upon *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).  Trial Transcript 3/3/05 (Dkt. No. 397) at 3264-70.  My charge also instructed that the jury could award a reasonable royalty, and that such a measure was the minimum amount of damages recoverable in the event of a finding of infringement.  Trial Transcript 3/3/05 (Dkt. No. 397) at 3264-70.  In its response to the court's prepared jury verdict form, the jury found infringement by Cargill of all eight claims of the '793 patent and found that the Sears parties suffered $355,422 in lost profits, additionally concluding that Cargill would have paid $1,777,113 as a reasonable royalty, based upon its infringing conduct, up to the date of the verdict.

In my earlier post-trial decision, I declined Sears' invitation to allow

its recovery of both reasonable royalties and the lost profits awarded by the jury, finding that it would be unduly speculative based upon the evidence adduced at trial to assume that absent Cargill's infringing conduct, Sears would have entered into licenses under the '793 patent with other potential sellers of treated salt and derived $355,422 in profit under those licenses – the theory now espoused by Sears in support of its contention that both awards should be allowed to stand.  Decision and Order dated 4/12/05 (Dkt. No. 358) at 40-42.  Having reconsidered the matter in light of the arguments now presented by Sears, I find no basis to alter my position in this matter.

I note, moreover, that to allow inclusion of that amount into the judgment would result in a double recovery by the Sears parties.  In its verdict, the jury awarded Sears Petroleum an identical amount – $355,422 – as damages for unfair competition, and for breach of contract.  It is true that the jury expressly stated that none of the amount awarded for unfair competition had been included in any prior award.  This perhaps supports the position now urged by defendants, to the effect the jury hypothesized that, but for Cargill's infringing conduct, they would have been able to fully exploit the benefits of the '793 patent by entering into licenses with other

salt companies.  Unfortunately, however, Sears did not offer the jury a basis, either through expert testimony or otherwise, to allow it to calculate, without undue speculation, the amount of license fees which Sears would have realized under such agreements.

Because I am neither convinced that inclusion of the $355,422 into the judgment would not represent endorsement of an unduly speculative jury award, nor am I certain that this would not result in a double recovery by the Sears parties, I deny Sears' request for amendment of the judgment in this regard.

### 2.   Prejudgment Interest

Sears' motion for alteration of the judgment, in which it asks the court to revisit an issue already aired and addressed, is made under Rule 59(e) of the Federal Rules of Civil Procedure.  Under that rule a judgment, once entered, may be amended only in the event of a "clear error of law or [a] manifest injustice."  *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (citations and internal quotations omitted).  When a Rule 59(e) motion addresses a matter already considered by the court, it is governed by an even more exacting standard.  *E.g.*, *Wilson v. Great Am. Indus., Inc.*, 770 F. Supp. 85, 89 (N.D.N.Y. 1991) (McCurn, J.).  In such an

instance, reconsideration is generally granted only in the event of "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Wilson*, 770 F. Supp. at 89 (citations and internal quotations omitted); *see also Range Rd. Music, Inc. v. Music Sales Corp.*, 90 F. Supp.2d 390, 391-92 (S.D.N.Y. 2000). Mere disagreement with the court's prior ruling does not constitute a basis for reconsideration of a judgment entered. *Range Rd. Music, Inc.*, 90 F. Supp.2d at 392.

The question of pre-judgment interest, including both the rate to be applied and the method of compounding, is entrusted to the sound discretion of the court. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556-57 (Fed. Cir. 1984); *Lam, Inc.*, 718 F.2d at 1066. In exercising that discretion, I determined that interest should be compounded annually, rather than monthly, as Sears now requests. Decision and Order dated 4/12/05 (Dkt. No. 358) at 44. As Cargill argues, payment of royalties annually, as well as annual compounding of interest, are an accepted practice within the patent field, although to be sure there are many cases that order compounding with greater frequency. *Compare Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955

(Fed. Cir. 1997); *Accuscan, Inc. v. Xerox Corp.*, 96 Civ. 2579, 2000 U.S.

Dist. LEXIS 2822, at *6-*7 (S.D.N.Y. March 14, 2000); *Michaels v. Art*

*Betterley Enters.*, 90-CV-1015, 1996 U.S. Dist. LEXIS 18671, at *15

(W.D.N.Y. Dec. 12, 1996) (all compounding interest annually) *with Lampi*

*Corp. v. American Power Prods., Inc.*, No. 93 C 1225, 2004 WL 1656547,

at *8 (N.D. Ill. July 22, 2004); *Seal-Flex, Inc. v. W.R. Dougherty &*

*Assocs., Inc.*, 254 F.Supp.2d 647, 687 (E.D. Mich. 2003) (all

compounding interest on a monthly basis).

Having reviewed the matter and my prior determination, I find no

basis to conclude that the rigid standards of Rule 59(e) for amendment of

a judgment have been met, and will therefore deny this aspect of Sears'

motion as well.

### 3.    Reconsideration Of Stay Provisions

The third component of Sears' final motion seeks reconsideration of

the court's stay provisions, and in particular the surety requirement.  In its

motion, Sears urges the court to consider a post-trial declaration from

Michael Hoerle, a key Cargill management employee who testified at trial,

attesting to Cargill's profit per ton of Clear Lane liquid as having tripled

from the $1.86 figure offered by Cargill at trial to over $5.00 at the time of

his declaration, a fact which Cargill attributes to having now fully recaptured "sunken costs" associated with development of the product. On the basis of that declaration, and in light of the passage of time and corresponding inflationary tendencies, Sears requests the royalty rate used to calculate the bond amount be increased from $1.50 to at least $1.73, and further to $3.00 if the court deems appropriate, to address Cargill's marked profit increase.

Having reviewed the matter carefully, I find no basis to disturb my earlier determination that a bond in the amount of $1.5 million is adequate to guaranty payment of reasonable royalties based upon the sale of infringing products beyond the date of entry of the judgment.

## IV.    SUMMARY AND CONCLUSION

At the close of a grueling, hard fought four week trial, the jury in this case was presented with many complex issues to resolve based upon a lengthy court charge and evidence which included the testimony from twenty-one witnesses and hundreds of often lengthy exhibits.  To aid in that process the jury was presented with a verdict form which consisted of thirty-eight questions, several of which contained subparts.  After five days of deliberations the hard working jury of seven returned a verdict which,

while in all likelihood a disappointment to both sides, and decidedly conservative on the issue of damages, was internally consistent, logical, and well supported by the evidence.  Neither side has presented the court with any basis to disturb that verdict in any respect.

In their motion the Sears defendants, as prevailing parties, request the court enhance the jury's award of patent damages, and to declare this an exceptional case and award non-taxable costs and attorney fees. Absent a jury determination of willfulness, the enhancement of damages would be inappropriate.  In light, however, of the fact that defendants' actions involved the theft and intentional copying of Sears' product, and their litigation strategy throughout the course of this case appears to have been designed to take advantage of its huge financial size and resources compared to the relative smallness of the Sears parties by increasing litigation costs at every turn, I find this to be an exceptional case, and accordingly will award costs and attorney fees to Sears.  In my view, requiring Sears to expend an estimated $2.8 million in fees and costs, taxable and non-taxable, to prosecute this case and recover only $2.8 million despite a finding of theft of its trade secrets and intentional patent infringement by a major corporation such as Cargill, would be inherently

unjust.

Based upon the foregoing it is hereby

ORDERED as follows:

1)     Defendants' motion to alter the judgment and to award enhanced damages pursuant to 35 U.S.C. § 284 (Dkt. No. 367) is DENIED.

2)     Defendants' motion to alter the judgment to include in the judgment entered the jury's award of loss profits, in the amount of $355,422 (Dkt. No. 369), is DENIED.

3)     Plaintiff's motion for a new trial (Dkt. No. 371) is DENIED.

4)     Plaintiff's motion for judgment as a matter of law on defendants' common law counterclaims (Dkt. No. 370) is DENIED.

5)     Plaintiff's motion for judgment as a matter of law or, in the alternative, a new trial on patent related issues (Dkt. No. 373) is DENIED.

6)     Defendants' motion for an award of attorney fees and nontaxable costs (Dkt. No. 368) is GRANTED.

7)     Defendants shall file with the court, within thirty (30) days from the date of this order, an itemized accounting of the fees and costs incurred, together with supporting documentation and information

regarding the basis for calculating the fees and costs claimed by the

defendants.  Within thirty (30) days following the filing of that application,

Cargill shall file with the court any objections to defendants' fee

application.  Sears shall file and serve any reply regarding its fee

application within fourteen (14) days after the filing of Cargill's opposition.

8)    The clerk is directed to promptly forward copies of this order to

the parties by electronic means.

_____

_____

David E. Peebles
U.S. Magistrate Judge

G:\Civil\2003\03-CV-0530\dec&order5.wpd